UNITED STATES *v.* JOHNSON, PERSONAL REPRESENTATIVE OF THE ESTATE OF JOHNSON

No. 85–2039.   Argued February 24, 1987—Decided May 18, 1987

POWELL, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, BLACKMUN, and O'CONNOR, JJ., joined. SCALIA, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and STEVENS, JJ., joined, *post*, p. 692.

*Deputy Solicitor General Ayer* argued the cause for the United States. With him on the briefs were *Solicitor General Fried, Assistant Attorney General Willard, Christopher J. Wright,* and *Nicholas S. Zeppos.*

*Joel D. Eaton* argued the cause and filed a brief for respondent.*

JUSTICE POWELL delivered the opinion of the Court

This case presents the question whether the doctrine established in *Feres* v. *United States*, 340 U. S. 135 (1950), bars an action under the Federal Tort Claims Act on behalf of a service member killed during the course of an activity incident to service, where the complaint alleges negligence on the part of civilian employees of the Federal Government.

I

Lieutenant Commander Horton Winfield Johnson was a helicopter pilot for the United States Coast Guard, stationed

---

*Donald L. Salem* filed a brief for William H. Gilardy, Jr., et al., as *amici curiae* urging affirmance.

in Hawaii. In the early morning of January 7, 1982, Johnson's Coast Guard station received a distress call from a boat lost in the area. Johnson and a crew of several other Coast Guard members were dispatched to search for the vessel. Inclement weather decreased the visibility, and so Johnson requested radar assistance from the Federal Aviation Administration (FAA), a civilian agency of the Federal Government. The FAA controllers assumed positive radar control over the helicopter. Shortly thereafter, the helicopter crashed into the side of a mountain on the island of Molokai. All the crew members, including Johnson, were killed in the crash.

Respondent, Johnson's wife, applied for and received compensation for her husband's death pursuant to the Veterans' Benefits Act, 72 Stat. 1118, as amended, 38 U. S. C. § 301 *et seq.* (1982 ed. and Supp. III).[1] In addition, she filed suit in the United States District Court for the Southern District of Florida under the Federal Tort Claims Act (FTCA), 28 U. S. C. §§ 1346, 2671–2680. Her complaint sought damages from the United States on the ground that the FAA flight controllers negligently caused her husband's death. The Government filed a motion to dismiss, asserting that because Johnson was killed during the course of his military duties, respondent could not recover damages from the United States. The District Court agreed and dismissed the complaint, relying exclusively on this Court's decision in *Feres.*

The Court of Appeals for the Eleventh Circuit reversed. 749 F. 2d 1530 (1985). It noted the language of *Feres* that precludes suits by service members against the Government

---

[1] Respondent has received $35,690.66 in life insurance and a $3,000 death gratuity, and receives approximately $868 per month in dependency and compensatory benefits. Brief for United States 3, n. 1. The dependency and compensatory benefits normally are payable for the life of the surviving spouse and include an extra monthly sum for any surviving child of the veteran below age 18. See 38 U. S. C. §§ 410, 411 (1982 ed. and Supp. III); 38 CFR § 3.461 (1986).

for injuries that "arise out of or are in the course of activity incident to service." 340 U. S., at 146. The court found, however, that the evolution of the doctrine since the *Feres* decision warranted a qualification of the original holding according to the status of the alleged tortfeasor. The court identified what it termed "the typical *Feres* factual paradigm" that exists when a service member alleges negligence on the part of another member of the military. 749 F. 2d, at 1537. "[W]hen the *Feres* factual paradigm is present, the issue is whether the injury arose out of or during the course of an activity incident to service." *Ibid.* But when negligence is alleged on the part of a Federal Government employee who is not a member of the military, the court found that the propriety of a suit should be determined by examining the rationales that underlie the *Feres* doctrine. Although it noted that this Court has articulated numerous rationales for the doctrine,[2] it found the effect of a suit on military discipline to be the doctrine's primary justification.

Applying its new analysis to the facts of this case, the court found "absolutely no hint . . . that the conduct of any alleged tortfeasor even remotely connected to the military will be scrutinized if this case proceeds to trial." 749 F. 2d, at 1539.

---

[2] We have identified three factors that underlie the *Feres* doctrine: "First, the relationship between the Government and members of its Armed Forces is ' "distinctively federal in character" '; it would make little sense to have the Government's liability to members of the Armed Services dependent on the fortuity of where the soldier happened to be stationed at the time of the injury. Second, the Veterans' Benefits Act establishes, as a substitute for tort liability, a statutory 'no fault' compensation scheme which provides generous pensions to injured servicemen, without regard to any negligence attributable to the Government. A third factor . . . [is] '[t]he peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of such suits on discipline, and the extreme results that might obtain if suits under the Tort Claims Act were allowed for negligent orders given or negligent acts committed in the course of military duty . . . .' " *Stencel Aero Engineering Corp.* v. *United States*, 431 U. S. 666, 671–672 (1977) (citations omitted).

Accordingly, it found that *Feres* did not bar respondent's suit. The court acknowledged that the Court of Appeals for the Ninth Circuit, "in a case strikingly similar to this one, has reached the opposite conclusion." 749 F. 2d, at 1539 (citing *Uptegrove* v. *United States*, 600 F. 2d 1248 (1979), cert. denied, 444 U. S. 1044 (1980)).[3] It concluded, however, that "*Uptegrove* was wrongly decided," 749 F. 2d, at 1539, and declined to reach the same result.

The Court of Appeals granted the Government's suggestion for rehearing en banc. The en banc court found that this Court's recent decision in *United States* v. *Shearer*, 473 U. S. 52 (1985), "reinforc[ed] the analysis set forth in the panel opinion," 779 F. 2d 1492, 1493 (1986) *(per curiam)*, particularly the "[s]pecial emphasis . . . upon military discipline and whether or not the claim being considered would require civilian courts to second-guess military decisions," *id.*, at 1493–1494. It concluded that the panel properly had evaluated the claim under *Feres* and therefore reinstated the panel opinion. Judge Johnson, joined by three other judges, strongly dissented. The dissent rejected the "*Feres* factual paradigm" as identified by the court, finding that because "Johnson's injury was undoubtedly sustained incident to service, . . . under current law our decision ought to be a relatively straightforward affirmance." *Id.*, at 1494.

We granted certiorari, 479 U. S. 811 (1986), to review the Court of Appeals' reformulation of the *Feres* doctrine and to resolve the conflict among the Circuits on the issue.[4] We now reverse.

---

[3] In *Uptegrove*, the wife of a Navy lieutenant killed while flying home on an Air Force C–141 transport brought suit against the Government under the FTCA, alleging negligence on the part of three FAA air traffic controllers. The court in *Uptegrove* dismissed the suit on the basis of *Feres*.

[4] In addition to the decision of the Court of Appeals for the Ninth Circuit in *Uptegrove* v. *United States*, 600 F. 2d 1248 (1979), cert. denied, 444 U. S. 1044 (1980), specifically acknowledged by the Court of Appeals in this case, the decision conflicts in principle with the decisions of the Courts of Appeals cited in n. 8, *infra*.

## II

In *Feres*, this Court held that service members cannot bring tort suits against the Government for injuries that "arise out of or are in the course of activity incident to service." 340 U. S., at 146. This Court has never deviated from this characterization of the *Feres* bar.[5] Nor has Congress changed this standard in the close to 40 years since it was articulated, even though, as the Court noted in *Feres*, Congress "possesses a ready remedy" to alter a misinterpretation of its intent. *Id.*, at 138.[6] Although all of the cases decided by this Court under *Feres* have involved allegations of negligence on the part of members of the military, this Court has never suggested that the military status of the alleged tortfeasor is crucial to the application of the doctrine.[7]

---

[5] See *United States* v. *Brown*, 348 U. S. 110, 112 (1954); *United States* v. *Muniz*, 374 U. S. 150, 159 (1963); *Stencel Aero Engineering Corp.* v. *United States, supra*, at 671; *Chappell* v. *Wallace*, 462 U. S. 296, 299 (1983); *United States* v. *Shearer*, 473 U. S. 52, 57 (1985).

[6] Congress has recently considered, but not enacted, legislation that would allow service members to bring medical malpractice suits against the Government. See H. R. 1161, 99th Cong., 1st Sess. (1985); H. R. 1942, 98th Cong., 1st Sess. (1983).

[7] In two places in the *Feres* opinion, the Court suggested that the military status of the tortfeasor might be relevant to its decision. First, the Court identified "[t]he common fact underlying the three cases" as being "that each claimant, while on active duty and not on furlough, sustained injury *due to negligence of others in the armed forces.*" 340 U. S., at 138 (emphasis added). Second, in discussing one of several grounds for the holding, the Court stated: "It would hardly be a rational plan of providing for those disabled in service *by others in service* to leave them dependent upon geographic considerations over which they have no control." *Id.*, at 143 (emphasis added). Nevertheless, the language of the opinion, viewed as a whole, is broad: "We know of no American law which ever has permitted a soldier to recover for negligence, against either his superior officers *or the Government he is serving,*" *id.*, at 141 (emphasis added; footnote omitted); " 'To whatever extent state law may apply to govern the relations between soldiers or others in the armed forces and persons outside them or *nonfederal governmental agencies,* the scope, nature, legal incidents and consequences of the relation between persons in service *and the Govern-*

Nor have the lower courts understood this fact to be relevant under *Feres*.[8]   Instead, the *Feres* doctrine has been applied consistently to bar all suits on behalf of service members

*ment* are fundamentally derived from federal sources and governed by federal authority.'" *Id.*, at 143–144 (quoting *United States* v. *Standard Oil Co.*, 332 U. S. 301, 305–306 (1947)) (emphasis added; citations omitted). See *id.*, at 142 (finding relevant "the status of *both* the wronged and the wrongdoer") (emphasis added).

Although one decision since *Feres* noted the military status of the tortfeasors, see *United States* v. *Brown, supra,* at 112, it did not rely on that fact.   See 348 U. S., at 113 ("We adhere . . . to the line drawn in the *Feres* case between injuries that did and injuries that did not arise out of or in the course of military duty").   Moreover, it is the broad language that consistently has been repeated in recent decisions describing the *Feres* doctrine.   See *Chappell* v. *Wallace, supra,* at 299 ("Congress did not intend to subject *the Government* to . . . claims [for injuries suffered in service] by a member of the Armed Forces") (emphasis added); *Stencel Aero Engineering Corp.* v. *United States*, 431 U. S., at 669 ("In *Feres* . . . the Court held that an on-duty serviceman who is injured due to *the negligence of Government officials* may not recover against the United States under the Federal Tort Claims Act") (emphasis added); *Dalehite* v. *United States*, 346 U. S. 15, 31, n. 25 (1953) (characterizing the *Feres* cases as involving "injuries . . . allegedly caused by *negligence of employees of the United States*") (emphasis added).

[8] The list of cases compiled by the dissent below, 779 F. 2d 1492, 1495–1496 (1986), in which the lower courts have interpreted *Feres* to bar suit against the Government even though the negligence alleged was on the part of a civilian employee is worth repeating: *Potts* v. *United States*, 723 F. 2d 20 (CA6 1983) (Navy corpsman injured when struck by a broken cable from a hoist operated by civilians), cert. denied, 466 U. S. 959 (1984); *Warner* v. *United States*, 720 F. 2d 837 (CA5 1983) (off-duty Army enlisted man injured on base when motorcycle collided with shuttle bus driven by civilian Government employee); *Jaffee* v. *United States*, 663 F. 2d 1226 (CA3 1981) (serviceman injured by radiation exposure allegedly due in part to intentional tort of civilian Department of Defense employees), cert. denied, 456 U. S. 972 (1982); *Lewis* v. *United States*, 663 F. 2d 889 (CA9 1981) (Marine Corps pilot killed in crash allegedly due to negligence of Government maintenance employees), cert. denied, 457 U. S. 1133 (1982); *Carter* v. *Cheyenne*, 649 F. 2d 827 (CA10 1981) (Air Force captain killed in crash at city airport for which city brought third-party claim against FAA air traffic controllers); *Woodside* v. *United States*, 606 F. 2d 134 (CA6 1979)

against the Government based upon service-related injuries. We decline to modify the doctrine at this late date.[9]

## A

This Court has emphasized three broad rationales underlying the *Feres* decision. See *Stencel Aero Engineering Corp.*

(Air Force officer killed in plane crash allegedly due to negligence of civilian flight instructor employed by military flight club), cert. denied, 445 U. S. 904 (1980); *Uptegrove* v. *United States,* 600 F. 2d 1248 (CA9 1979) (see n. 3, *supra*), cert. denied, 444 U. S. 1044 (1980); *Watkins* v. *United States,* 462 F. Supp. 980 (SD Ga. 1977) (serviceman killed on base when motorcycle collided with shuttle bus driven by civilian Government employee), aff'd, 587 F. 2d 279 (CA5 1979); *Hass* v. *United States,* 518 F. 2d 1138 (CA4 1975) (suit by serviceman against civilian manager of military-owned horse stable); *United States* v. *Lee,* 400 F. 2d 558 (CA9 1968) (serviceman killed in crash of military aircraft allegedly due to FAA air traffic controller negligence), cert. denied, 393 U. S. 1053 (1969); *Sheppard* v. *United States,* 369 F. 2d 272 (CA3 1966) (same), cert. denied, 386 U. S. 982 (1967); *Layne* v. *United States,* 295 F. 2d 433 (CA7 1961) (National Guardsman killed on training flight allegedly due to negligence of civilian air traffic controllers), cert. denied, 368 U. S. 990 (1962); *United Air Lines, Inc.* v. *Wiener,* 335 F. 2d 379 (CA9) (serviceman injured in part due to alleged CAA employee negligence), cert. dismissed *sub nom. United Air Lines, Inc.* v. *United States,* 379 U. S. 951 (1964).

[9] JUSTICE SCALIA indicates that he would consider overruling *Feres* had this been requested by counsel, but in the absence of such a request he would "confine the unfairness and irrationality [of] that decision" to cases where the allegations of negligence are limited to other members of the military. *Post,* at 703. In arguing "unfairness" in this case, JUSTICE SCALIA assumes that had respondent been "piloting a commercial helicopter" his family might recover substantially more in damages than it now may recover under the benefit programs available for a serviceman and his family. *Ibid.* It hardly need be said that predicting the outcome of any damages suit—both with respect to liability and the amount of damages—is hazardous, whereas veterans' benefits are guaranteed by law. *Post,* at 697. If "fairness"—in terms of pecuniary benefits—were the issue, one could respond to the dissent's assumption by noting that had the negligent instructions that led to Johnson's death been given by another serviceman, the consequences—under the dissent's view—would be equally "unfair." "Fairness" provides no more justification for the line drawn by the dissent than it does for the line upon which application of the

v. *United States*, 431 U. S. 666, 671–673 (1977), and n. 2, *supra*. An examination of these reasons for the doctrine demonstrates that the status of the alleged tortfeasor does not have the critical significance ascribed to it by the Court of Appeals in this case. First, "[t]he relationship between the Government and members of its armed forces is 'distinctively federal in character.'" *Feres*, 340 U. S., at 143 (quoting *United States* v. *Standard Oil Co.*, 332 U. S. 301, 305 (1947)). This federal relationship is implicated to the greatest degree when a service member is performing activities incident to his federal service. Performance of the military function in diverse parts of the country and the world entails a "[s]ignificant risk of accidents and injuries." *Stencel Aero Engineering Corp.* v. *United States, supra*, at 672. Where a service member is injured incident to service—that is, because of his military relationship with the Government—it "makes no sense to permit the fortuity of the situs of the alleged negligence to affect the liability of the Government to [the] serviceman." 431 U. S., at 672. Instead, application of the underlying federal remedy that provides "simple, certain, and uniform compensation for injuries or death of those in armed services," *Feres, supra*, at 144 (footnote omitted), is appropriate.

Second, the existence of these generous statutory disability and death benefits is an independent reason why the *Feres* doctrine bars suit for service-related injuries.[10] In *Feres*, the Court observed that the primary purpose of the

*Feres* doctrine has always depended: whether the injury was "incident to service?" In sum, the dissent's argument for changing the interpretation of a congressional statute, when Congress has failed to do so for almost 40 years, is unconvincing.

[10] Service members receive numerous other benefits unique to their service status. For example, members of the military and their dependents are eligible for educational benefits, extensive health benefits, home-buying loan benefits, and retirement benefits after a minimum of 20 years of service. See generally Uniformed Services Almanac (L. Sharff & S. Gordon eds. 1985).

FTCA "was to extend a remedy to those who had been without; if it incidentally benefited those already well provided for, it appears to have been unintentional." 340 U. S., at 140. Those injured during the course of activity incident to service not only receive benefits that "compare extremely favorably with those provided by most workmen's compensation statutes," *id.*, at 145, but the recovery of benefits is "swift [and] efficient," *Stencel Aero Engineering Corp.* v. *United States, supra*, at 673, "normally requir[ing] no litigation," *Feres, supra*, at 145. The Court in *Feres* found it difficult to believe that Congress would have provided such a comprehensive system of benefits while at the same time contemplating recovery for service-related injuries under the FTCA. Particularly persuasive was the fact that Congress "omitted any provision to adjust these two types of remedy to each other." 340 U. S., at 144. Congress still has not amended the Veterans' Benefits Act or the FTCA to make any such provision for injuries incurred during the course of activity incident to service. We thus find no reason to modify what the Court has previously found to be the law: the statutory veterans' benefits "provid[e] an upper limit of liability for the Government as to service-connected injuries." *Stencel Aero Engineering Corp.* v. *United States, supra*, at 673. See *Hatzlachh Supply Co.* v. *United States*, 444 U. S. 460, 464 (1980) *(per curiam)* ("[T]he Veterans' Benefits Act provided compensation to injured servicemen, which we understood Congress intended to be the sole remedy for service-connected injuries").

Third, *Feres* and its progeny indicate that suits brought by service members against the Government for injuries incurred incident to service are barred by the *Feres* doctrine because they are the *"type[s] of* claims that, if generally permitted, would involve the judiciary in sensitive military affairs at the expense of military discipline and effectiveness." *United States* v. *Shearer*, 473 U. S., at 59 (emphasis in original). In every respect the military is, as this Court has rec-

ognized, "a specialized society." *Parker* v. *Levy*, 417 U. S. 733, 743 (1974). "[T]o accomplish its mission the military must foster instinctive obedience, unity, commitment, and esprit de corps." *Goldman* v. *Weinberger*, 475 U. S. 503, 507 (1986). Even if military negligence is not specifically alleged in a tort action, a suit based upon service-related activity necessarily implicates the military judgments and decisions that are inextricably intertwined with the conduct of the military mission.[11] Moreover, military discipline involves not only obedience to orders, but more generally duty and loyalty to one's service and to one's country. Suits brought by service members against the Government for service-related injuries could undermine the commitment essential to effective service and thus have the potential to disrupt military discipline in the broadest sense of the word.

## B

In this case, Lieutenant Commander Johnson was killed while performing a rescue mission on the high seas, a primary duty of the Coast Guard. See 14 U. S. C. §§ 2, 88(a)(1).[12] There is no dispute that Johnson's injury arose directly out of the rescue mission, or that the mission was an activity incident to his military service. Johnson went on the rescue mission specifically because of his military status. His wife received and is continuing to receive statutory benefits on account of his death. Because Johnson was acting pursuant to standard operating procedures of the Coast

---

[11] Civilian employees of the Government also may play an integral role in military activities. In this circumstance, an inquiry into the civilian activities would have the same effect on military discipline as a direct inquiry into military judgments. For example, the FAA and the United States Armed Services have an established working relationship that provides for FAA participation in numerous military activities. See FAA, United States Dept. of Transportation, Handbook 7610.4F: Special Military Operations (Jan. 21, 1981).

[12] The Coast Guard, of course, is a military service, and an important branch of the Armed Services. 14 U. S. C. § 1.

Guard, the potential that this suit could implicate military discipline is substantial. The circumstances of this case thus fall within the heart of the *Feres* doctrine as it consistently has been articulated.

### III

We reaffirm the holding of *Feres* that "the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." 340 U. S., at 146. Accordingly, we reverse the judgment of the Court of Appeals for the Eleventh Circuit and remand for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE STEVENS join, dissenting.

As it did almost four decades ago in *Feres* v. *United States*, 340 U. S. 135 (1950), the Court today provides several reasons why Congress might have been wise to exempt from the Federal Tort Claims Act (FTCA), 28 U. S. C. §§ 1346(b), 2671–2680, certain claims brought by servicemen. The problem now, as then, is that Congress not only failed to provide such an exemption, but quite plainly excluded it. We have not been asked by respondent here to overrule *Feres;* but I can perceive no reason to accept petitioner's invitation to extend it as the Court does today.

### I

Much of the sovereign immunity of the United States was swept away in 1946 with passage of the FTCA, which renders the Government liable

> "for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United

States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U. S. C. § 1346(b).

Read as it is written, this language renders the United States liable to *all* persons, including servicemen, injured by the negligence of Government employees. Other provisions of the Act set forth a number of exceptions, but none generally precludes FTCA suits brought by servicemen. One, in fact, excludes "[a]ny claim arising out of the *combatant activities* of the military or naval forces, or the Coast Guard, *during time of war*," § 2680(j) (emphasis added), demonstrating that Congress specifically considered, and provided what it thought needful for, the special requirements of the military. There was no proper basis for us to supplement—*i. e.*, revise—that congressional disposition.

In our first encounter with an FTCA suit brought by a serviceman, we gave effect to the plain meaning of the statute. In *Brooks* v. *United States*, 337 U. S. 49 (1949), military personnel had been injured in a collision with an Army truck while off duty. We rejected the Government's argument that those injured while enlisted in the military can never recover under the FTCA. We noted that the Act gives the District Courts "jurisdiction over *any* claim founded on negligence brought against the United States" and found the Act's exceptions "too lengthy, specific, and close to the present problem" to permit an inference that, notwithstanding the literal language of the statute, Congress intended to bar all suits brought by servicemen. *Id.*, at 51. Particularly in light of the exceptions for claims arising out of combatant activities, 28 U. S. C. § 2680(j), and in foreign countries, § 2680(k), we said, "[i]t would be absurd to believe that Congress did not have the servicemen in mind" in passing the FTCA. 337 U. S., at 51. We therefore concluded that the plaintiffs in *Brooks* could sue under the Act. In dicta, however, we cautioned that an attempt by a serviceman to recover for injuries suffered "incident to . . . service" would

present "a wholly different case," *id.*, at 52, and that giving effect to the "literal language" of the FTCA in such a case might lead to results so "outlandish" that recovery could not be permitted, *id.*, at 53.

That "wholly different case" reached us one year later in *Feres*. We held that servicemen could not recover under the FTCA for injuries that "arise out of or are in the course of activity incident to service," 340 U. S., at 146, and gave three reasons for our holding. First, the parallel private liability required by the FTCA was absent. *Id.*, at 141–142. Second, Congress could not have intended that local tort law govern the "distinctively federal" relationship between the Government and enlisted personnel. *Id.*, at 142–144. Third, Congress could not have intended to make FTCA suits available to servicemen who have already received veterans' benefits to compensate for injuries suffered incident to service. *Id.*, at 144–145. Several years after *Feres* we thought of a fourth rationale: Congress could not have intended to permit suits for service-related injuries because they would unduly interfere with military discipline. *United States* v. *Brown*, 348 U. S. 110, 112 (1954).

In my view, none of these rationales justifies the result. Only the first of them, the "parallel private liability" argument, purports to be textually based, as follows: The United States is liable under the FTCA "in the same manner and to the same extent as a private individual under like circumstances," 28 U. S. C. § 2674; since no "private individual" can raise an army, and since no State has consented to suits by members of its militia, § 2674 shields the Government from liability in the *Feres* situation. 340 U. S., at 141–142. Under this reasoning, of course, many of the Act's exceptions are superfluous, since private individuals typically do not, for example, transmit postal matter, 28 U. S. C. § 2680(b), collect taxes or customs duties, § 2680(c), impose quarantines, § 2680(f), or regulate the monetary system, § 2680(i). In any event, we subsequently recognized our error and rejected

*Feres'* "parallel private liability" rationale. See *Rayonier, Inc.* v. *United States,* 352 U. S. 315, 319 (1957); *Indian Towing Co.* v. *United States,* 350 U. S. 61, 66–69 (1955).

Perhaps without that scant (and subsequently rejected) textual support, which could be pointed to as the embodiment of the legislative intent that its other two rationales speculated upon, the *Feres* Court would not as an original matter have reached the conclusion that it did. Be that as it may, the speculation outlived the textual support, and the *Feres* rule is now sustained only by three disembodied estimations of what Congress *must* (despite what it enacted) have intended. They are bad estimations at that. The first of them, *Feres'* second rationale, has barely escaped the fate of the "parallel private liability" argument, for though we have not yet acknowledged that it is erroneous we have described it as "no longer controlling." *United States* v. *Shearer,* 473 U. S. 52, 58, n. 4 (1985). The rationale runs as follows: Liability under the FTCA depends upon "the law of the place where the [negligent] act or omission occurred," 28 U. S. C. § 1346(b); but Congress could not have intended local, and therefore geographically diverse, tort law to control important aspects of the "distinctively federal" relationship between the United States and enlisted personnel. 340 U. S., at 142–144. *Feres* itself was concerned primarily with the *unfairness to the soldier* of making his recovery turn upon where he was injured, a matter outside of his control. *Id.,* at 142–143. Subsequent cases, however, have stressed the *military's need for uniformity* in its governing standards. See, *e. g., Stencel Aero Engineering Corp.* v. *United States,* 431 U. S. 666, 672 (1977). Regardless of how it is understood, this second rationale is not even a good excuse in policy, much less in principle, for ignoring the plain terms of the FTCA.

The unfairness to servicemen of geographically varied recovery is, to speak bluntly, an absurd justification, given that, as we have pointed out in another context, nonuniform

recovery cannot possibly be worse than (what *Feres* provides) uniform nonrecovery. See *United States* v. *Muniz,* 374 U. S. 150, 162 (1963). We have abandoned this peculiar rule of solicitude in allowing federal prisoners (who have no more control over their geographical location than servicemen) to recover under the FTCA for injuries caused by the negligence of prison authorities. See *ibid.* There seems to me nothing "unfair" about a rule which says that, just as a serviceman injured by a negligent *civilian* must resort to state tort law, so must a serviceman injured by a negligent Government employee.

To the extent that the rationale rests upon the military's need for uniformity, it is equally unpersuasive. To begin with, that supposition of congressional intent is positively contradicted by the text. Several of the FTCA's exemptions show that Congress considered the uniformity problem, see, *e. g.,* 28 U. S. C. §§ 2680(b), 2680(i), 2680(k), yet it chose to retain sovereign immunity for only some claims affecting the military. § 2680(j). Moreover, we have effectively disavowed this "uniformity" justification—and rendered its benefits to military planning illusory—by permitting servicemen to recover under the FTCA for injuries suffered not incident to service, and permitting *civilians* to recover for injuries caused by military negligence. See, *e. g., Indian Towing Co.* v. *United States, supra.* Finally, it is difficult to explain why uniformity (assuming our rule were achieving it) is indispensable for the military, but not for the many other federal departments and agencies that can be sued under the FTCA for the negligent performance of their "unique, nationwide function[s]," *Stencel Aero Engineering Corp.* v. *United States, supra,* at 675 (MARSHALL, J., dissenting), including, as we have noted, the federal prison system which may be sued under varying state laws by its inmates. See *United States* v. *Muniz, supra.* In sum, the second *Feres* rationale, regardless of how it is understood, is not a plausible estima-

tion of congressional intent, much less a justification for importing that estimation, unwritten, into the statute.

*Feres*'s third basis has similarly been denominated "no longer controlling." *United States* v. *Shearer, supra,* at 58, n. 4. Servicemen injured or killed in the line of duty are compensated under the Veterans' Benefits Act (VBA), 72 Stat. 1118, as amended, 38 U. S. C. §301 *et seq.* (1982 ed. and Supp. III), and the *Feres* Court thought it unlikely that Congress meant to permit additional recovery under the FTCA, 340 U. S., at 144–145. *Feres* described the absence of any provision to adjust dual recoveries under the FTCA and VBA as "persuasive [evidence] that there was no awareness that the Act might be interpreted to permit recovery for injuries incident to military service." *Id.,* at 144. Since *Feres* we have in dicta characterized recovery under the VBA as "the sole remedy for service-connected injuries," *Hatzlachh Supply Co.* v. *United States,* 444 U. S. 460, 464 (1980) *(per curiam),* and have said that the VBA "provides an upper limit of liability for the Government" for those injuries, *Stencel Aero Engineering Corp.* v. *United States, supra,* at 673.

The credibility of this rationale is undermined severely by the fact that both before and after *Feres* we permitted injured servicemen to bring FTCA suits, *even though they had been compensated under the VBA.* In *Brooks* v. *United States,* 337 U. S. 49 (1949), we held that two servicemen injured off duty by a civilian Army employee could sue the Government. The fact that they had already received VBA benefits troubled us little. We pointed out that "nothing in the Tort Claims Act or the veterans' laws . . . provides for exclusiveness of remedy" and we refused to "call either remedy . . . exclusive . . . when Congress has not done so." *Id.,* at 53. We noted further that Congress had included three exclusivity provisions in the FTCA, 28 U. S. C. §§2672, 2676, 2679, but had said nothing about servicemen plaintiffs, 337 U. S., at 53. We indicated, however, that VBA com-

pensation could be taken into account in adjusting recovery under the FTCA. *Id.*, at 53–54; see also *United States* v. *Brown*, 348 U. S., at 111, and n. That *Brooks* remained valid after *Feres* was made clear in *United States* v. *Brown*, *supra*, in which we stressed again that because "Congress had given no indication that it made the right to compensation [under the VBA] the veteran's exclusive remedy, . . . the receipt of disability payments . . . did not preclude recovery under the Tort Claims Act." *Id.*, at 113.

*Brooks* and *Brown* (neither of which has ever been expressly disapproved) plainly hold that the VBA is *not* an "exclusive" remedy which places an "upper limit" on the Government's liability. Because of *Feres* and today's decision, however, the VBA will in fact be exclusive for service-connected injuries, but not for others. Such a result can no more be reconciled with the text of the VBA than with that of the FTCA, since the VBA compensates servicemen without regard to whether their injuries occur "incident to service" as *Feres* defines that term. See 38 U. S. C. § 105. Moreover, the VBA is not, as *Feres* assumed, identical to federal and state workers' compensation statutes in which exclusivity provisions almost invariably appear. See, *e. g.*, 5 U. S. C. § 8116(c). Recovery is possible under workers' compensation statutes more often than under the VBA, and VBA benefits can be terminated more easily than can workers' compensation. See Note, From *Feres* to *Stencel:* Should Military Personnel Have Access to FTCA Recovery?, 77 Mich. L. Rev. 1099, 1106–1108 (1979). In sum, "the presence of an alternative compensation system [neither] explains [n]or justifies the *Feres* doctrine; it only makes the effect of the doctrine more palatable." *Hunt* v. *United States*, 204 U. S. App. D. C. 308, 326, 636 F. 2d 580, 598 (1980).

The foregoing three rationales—the only ones actually relied upon in *Feres*—are so frail that it is hardly surprising that we have repeatedly cited the later-conceived-of "military discipline" rationale as the "best" explanation for that deci-

sion. See *United States* v. *Shearer*, 473 U. S., at 57; *Chappell* v. *Wallace*, 462 U. S. 296, 299 (1983); *United States* v. *Muniz*, 374 U. S., at 162. Applying the FTCA as written would lead, we have reasoned, to absurd results, because if suits could be brought on the basis of alleged negligence towards a serviceman by other servicemen, military discipline would be undermined and civilian courts would be required to second-guess military decisionmaking. See *Stencel Aero Engineering Corp.* v. *United States*, 431 U. S., at 671–672, 673. (Today the Court goes further and suggests that permitting enlisted men and women to sue their Government on the basis of negligence towards them *by any Government employee* seriously undermines "duty and loyalty to one's service and to one's country." *Ante,* at 691.) I cannot deny the possibility that some suits brought by servicemen will adversely affect military discipline, and if we were interpreting an ambiguous statute perhaps we could take that into account. But I do not think the effect upon military discipline is so certain, or so certainly substantial, that we are justified in holding (if we can ever be justified in holding) that Congress did not mean what it plainly said in the statute before us.

It is strange that Congress' "obvious" intention to preclude *Feres* suits because of their effect on military discipline was discerned neither by the *Feres* Court nor by the Congress that enacted the FTCA (which felt it necessary expressly to exclude recovery for combat injuries). Perhaps Congress recognized that the likely effect of *Feres* suits upon military discipline is not as clear as we have assumed, but in fact has long been disputed. See Bennett, The *Feres* Doctrine, Discipline, and the Weapons of War, 29 St. Louis U. L. J. 383, 407–411 (1985). Or perhaps Congress assumed that the FTCA's explicit exclusions would bar those suits most threatening to military discipline, such as claims based upon combat command decisions, 28 U. S. C. § 2680(j); claims based upon performance of "discretionary" functions, § 2680(a); claims

arising in foreign countries, § 2680(k); intentional torts, § 2680 (h); and claims based upon the execution of a statute or regulation, § 2680(a). Or perhaps Congress assumed that, since liability under the FTCA is imposed upon the Government, and not upon individual employees, military decisionmaking was unlikely to be affected greatly. Or perhaps—most fascinating of all to contemplate—Congress thought that *barring* recovery by servicemen might adversely affect military discipline. After all, the morale of Lieutenant Commander Johnson's comrades-in-arms will not likely be boosted by news that his widow and children will receive only a fraction of the amount they might have recovered had he been piloting a commercial helicopter at the time of his death.

To the extent that reading the FTCA as it is written will require civilian courts to examine military decisionmaking and thus influence military discipline, it is outlandish to consider that result "outlandish," *Brooks* v. *United States*, 337 U. S., at 53, since in fact it occurs frequently, even under the *Feres* dispensation. If Johnson's helicopter had crashed into a civilian's home, the homeowner could have brought an FTCA suit that would have invaded the sanctity of military decisionmaking no less than respondent's. If a soldier is injured *not* "incident to service," he can sue his Government regardless of whether the alleged negligence was military negligence. And if a soldier suffers service-connected injury because of the negligence of a civilian (such as the manufacturer of an airplane), he can sue that civilian, even if the civilian claims contributory negligence and subpoenas the serviceman's colleagues to testify against him.

In sum, neither the three original *Feres* reasons nor the *post hoc* rationalization of "military discipline" justifies our failure to apply the FTCA as written. *Feres* was wrongly decided and heartily deserves the "widespread, almost universal criticism" it has received. *In re "Agent Orange"*

*Product Liability Litigation,* 580 F. Supp. 1242, 1246 (EDNY), appeal dism'd, 745 F. 2d 161 (CA2 1984).*

## II

The *Feres* Court claimed its decision was necessary to make "the entire statutory system of remedies against the Government . . . a workable, consistent and equitable whole." 340 U. S., at 139. I am unable to find such beauty in what we have wrought. Consider the following hypothetical (similar to one presented by Judge Weinstein in *In re "Agent Orange" Product Liability Litigation, supra,* at 1252): A serviceman is told by his superior officer to deliver some papers to the local United States Courthouse. As he nears his destination, a wheel on his Government vehicle breaks, causing the vehicle to injure him, his daughter (whose class happens to be touring the courthouse that day), and a United States marshal on duty. Under our case law and federal statutes, the serviceman may not sue the Government *(Feres);* the guard may not sue the Government (because of the exclusivity provision of the Federal Employees' Compensation Act (FECA),

---

*See, *e. g., Sanchez* v. *United States,* 813 F. 2d 593, 595 (CA2 1987); *Bozeman* v. *United States,* 780 F. 2d 198, 200 (CA2 1985); *Hinkie* v. *United States,* 715 F. 2d 96, 97 (CA3 1983), cert. denied, 465 U. S. 1023 (1984); *Mondelli* v. *United States,* 711 F. 2d 567, 569 (CA3 1983), cert. denied, 465 U. S. 1021 (1984); *Scales* v. *United States,* 685 F. 2d 970, 974 (CA5 1982), cert. denied, 460 U. S. 1082 (1983); *LaBash* v. *United States Dept. of Army,* 668 F. 2d 1153, 1156 (CA10), cert. denied, 456 U. S. 1008 (1982); *Monaco* v. *United States,* 661 F. 2d 129, 132 (CA9 1981), cert. denied, 456 U. S. 989 (1982); *Hunt* v. *United States,* 204 U. S. App. D. C. 308, 317, 636 F. 2d 580, 589 (1980); *Veillette* v. *United States,* 615 F. 2d 505, 506 (CA9 1980); *Parker* v. *United States,* 611 F. 2d 1007, 1011 (CA5 1980); *Peluso* v. *United States,* 474 F. 2d 605, 606 (CA3), cert. denied, 414 U. S. 879 (1973); Bennett, The *Feres* Doctrine, Discipline, and the Weapons of War, 29 St. Louis U. L. J. 383 (1985); Hitch, The Federal Tort Claims Act and Military Personnel, 8 Rutgers L. Rev. 316 (1954); Rhodes, The Feres Doctrine After Twenty-Five Years, 18 A. F. L. Rev. 24 (Spring 1976); Note, 51 J. Air L. & Com. 1087 (1986); Note, 6 Cardozo L. Rev. 391 (1984); Note, 77 Mich. L. Rev. 1099 (1979); Note, 43 St. John's L. Rev. 455 (1969).

5 U. S. C. § 8116); the daughter may not sue the Government for the loss of her father's companionship *(Feres)*, but may sue the Government for her own injuries (FTCA).   The serviceman and the guard may sue the manufacturer of the vehicle, as may the daughter, both for her own injuries and for the loss of her father's companionship.   The manufacturer may assert contributory negligence as a defense in any of the suits.   Moreover, the manufacturer may implead the Government in the daughter's suit *(United States* v. *Yellow Cab Co.,* 340 U. S. 543 (1951)) and in the guard's suit *(Lockheed Aircraft Corp.* v. *United States,* 460 U. S. 190 (1983)), even though the guard was compensated under a statute that contains an exclusivity provision (FECA).   But the manufacturer may *not* implead the Government in the serviceman's suit *(Stencel Aero Engineering Corp.* v. *United States,* 431 U. S. 666 (1977)), even though the serviceman was compensated under a statute that does *not* contain an exclusivity provision (VBA).

The point is not that all of these inconsistencies are attributable to *Feres* (though some of them assuredly are), but merely that bringing harmony to the law has hardly been the consequence of our ignoring what Congress wrote and imagining what it should have written.   When confusion results from our applying the unambiguous text of a statute, it is at least a confusion validated by the free play of the democratic process, rather than what we have here: unauthorized rationalization gone wrong.   We realized seven years too late that "[t]here is no justification for this Court to read exemptions into the Act beyond those provided by Congress.   If the Act is to be altered that is a function for the same body that adopted it."   *Rayonier, Inc.* v. *United States,* 352 U. S., at 320 (footnote omitted).

I cannot take comfort, as the Court does, *ante,* at 686, and n. 6, from Congress' failure to amend the FTCA to overturn *Feres.*   The unlegislated desires of later Congresses with regard to one thread in the fabric of the FTCA could hardly

have any bearing upon the proper interpretation of the entire fabric of compromises that their predecessors enacted into law in 1946. And even if they could, intuiting those desires from congressional *failure* to act is an uncertain enterprise which takes as its starting point disregard of the checks and balances in the constitutional scheme of legislation designed to assure that not all desires of a majority of the Legislature find their way into law.

We have not been asked by respondent to overrule *Feres*, and so need not resolve whether considerations of *stare decisis* should induce us, despite the plain error of the case, to leave bad enough alone. As the majority acknowledges, however, "all of the cases decided by this Court under *Feres* have involved allegations of negligence on the part of members of the military." *Ante*, at 686. I would not extend *Feres* any further. I confess that the line between FTCA suits alleging military negligence and those alleging civilian negligence has nothing to recommend it except that it would limit our clearly wrong decision in *Feres* and confine the unfairness and irrationality that decision has bred. But that, I think, is justification enough.

Had Lieutenant Commander Johnson been piloting a commercial helicopter when he crashed into the side of a mountain, his widow and children could have sued and recovered for their loss. But because Johnson devoted his life to serving in his country's Armed Forces, the Court today limits his family to a fraction of the recovery they might otherwise have received. If our imposition of that sacrifice bore the legitimacy of having been prescribed by the people's elected representatives, it would (insofar as we are permitted to inquire into such things) be just. But it has not been, and it is not. I respectfully dissent.