¶ 83. DANIEL KELLY, J. (concurring in part, dissenting in part). I join the court's opinion except insofar as it concludes that Wis. Stat. § 895.446(3)(b) awards attorney's fees to prevailing plaintiffs. Stathus v. Horst,[1] our opinion's sole source of authority supporting that conclusion, is actually silent on the issue. And the legislature has been silent with respect to Stathus's silence. But in that doubly-quiet void we purport to hear not only an authoritative interpretation of a statute, but also the legislature's commendation of that unspoken interpretation. Because I hear no such thing, I must respectfully dissent from that part of our opinion. ¶ 84. The availability of attorney's fees depends entirely on what Wis. Stat. § 895.466(3) means when it says a prevailing plaintiff "may recover all of the following: . . . All costs of investigation and litigation that were reasonably incurred, including the value of the time spent by any employee or agent of the victim." Our methodology for discerning that meaning focuses on the statute's text, context, and structure. State ex rel. Kalal v. Cir. Ct. for Dane Cty., 2004 WI 58, ¶¶ 45-46, 271 Wis. 2d 633, 681 N.W.2d 110 ("[Statutory interpretation 'begins with the language of the statute.'. . . Context is important to meaning. So, too, is the structure of the statute in which the operative language appears. Therefore, statutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes . . . ." (internal citation omitted)). In performing this analysis, we carefully avoid ascribing an unreasonable or absurd meaning to the text. Id., ¶ 46 ("[Statutory language is interpreted . . . reasonably, to avoid absurd or unreasonable results." (citations omitted)). If we find the statute's plain meaning through this methodology, we go no further. Id., ¶ 45 ("If the meaning of the statute is plain, we ordinarily stop the inquiry.' " (quoting Seider v. O'Connell, 2000 WI 76, ¶ 43, 236 Wis. 2d 211, 612 N.W.2d 659)); see generally Daniel R. Suhr, Interpreting Wisconsin Statutes, 100 Marq. L. Rev. 969 (2017). ¶ 85. Our opinion does not conform to this methodology. Instead of "begin [ning] with the language of the statute," we began with a court opinion that did not address itself to the question sub judice. Instead of considering the statute's context and structure, we turned to a canard about the significance of legislative inaction. And we argued that it would be wise policy to award attorney's fees in situations like this—an argument on which I offer no comment except to say that the wisdom of a given policy makes the asserted meaning of a statute neither more nor less likely to be true. And then, at the end, we finally arrived at the statute's language, but only in search of justification for the conclusion we had already reached. This is a method of statutory interpretation so far removed from the practice we endorsed in Kalal that it is unrecognizable. I. WHAT STATHUS V. HORST CANNOT TELL US ¶ 86. Citing Kalal, our opinion says "[w]e begin with the language of the statute." Majority op., f 50. And we did, inasmuch as we quoted Wis. Stat. § 895.446(3) near the beginning of the attorney's fees section of our opinion. But Kalal is not telling us where we should place the quote—it is telling us that the language should be the first thing to capture our analytical attention. However, after quoting the statute, we promptly ignored it until giving it a paragraph's worth of attention at the end of our analysis, and then only after we had already concluded the language we did not construe awards attorney's fees to prevailing plaintiffs. Our analysis actually started with the invocation of a canon of construction to make it appear that Stathus said something it did not. ¶ 87. We said that the "Prior Construction Canon" requires us to read Wis. Stat. § 895.446(3) as awarding attorney's fees to prevailing plaintiffs. This interpretive aid counsels that "[i]f a statute uses words or phrases that have already received authoritative construction by the jurisdiction's court of last resort, or even uniform construction by inferior courts ... , they are to be understood according to that construction." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 322 (2012). We have never construed the language of § 895.446(3)(b), so the canon directs our attention to our court of appeals. f 88. We offered Stathus as the only candidate in which we may find an authoritative construction of the statute's language. But before we hunt through the Stathus opinion for such a thing, it's worth a short digression to describe the subject of our search. The term "construction" refers to the process by which we discover the meaning of the written law. It is "[t]he act or process of interpreting or explaining the sense or intention of a writing (usu. a statute, opinion, or instrument)." Black's Law Dictionary 308 (7th ed. 1999). Construction, as applied to written law, is the art or process of discovering and expounding the meaning and intention of the authors of the law with respect to its application to a given case, where that intention is rendered doubtful either by reason of apparently conflicting provisions or directions, or by reason of the fact that the given case is not explicitly provided for in the law. Id. (quoting Henry Campbell Black, Handbook on the Construction and Interpretation of the Laws 1 (1896)). ¶ 89. So if Stathus is to bear the weight we assign it, we should find in that opinion an effort to discover and expound on the meaning of Wis. Stat. § 895.446(3)(b) as it relates to liability for the plaintiffs attorney's fees. Stathus, of course, contains no such thing. Surprisingly, this is not even a point of contention—our opinion frankly admits the court of appeals did not construe the language in which we are interested: "We acknowledge that the Stathus court did not directly consider the issue of whether attorney fees were awardable; rather, in promulgating the standards by which a circuit court should determine whether an award of attorney fees under the statute is reasonable, the Stathus court assumed that attorney fees were awardable." Majority op., ¶ 52 n.21. Because the "Prior Construction Canon" performs its work on "constructions," our concession that Stathus contains only an assumption necessarily disqualifies it from the canon's operation. 1 90. But with a liberal application of a few more canons, we claim to have coaxed something authoritative out of Stathus: "This assumption, however, is a prior construction under the Predicate-Act Canon [2] and the Interpretation Principle [3] of statutory construction. . . . Thus, when the Stathus court remanded to the circuit court with instructions to 'apply the appropriate standards for determining "reasonableness" ' of attorney fees under the statute, it necessarily construed the statute as authorizing the award of attorney fees." Majority op., ¶ 52 n.21. No sentence that begins "[t]his assumption ... is a prior construction" can advance any logically defensible proposition. A "construction," as described above, is the discovery and exposition of meaning. An assumption is the absence of that. The laws of a rational universe forbid these being the same thing.[4] ¶ 91. Even without this error, the "Predicate-Act Canon" can provide no useful instruction here. It is certainly true that the Stathus court, in remanding the case to determine the reasonableness of the claimed attorney's fees, also authorized the circuit court to award those fees. But what of it? Our project here is discerning the meaning of a statute, not a matter's undisputed procedural history. But perhaps we mean to say the Stathus court's assumption was an "act" within the meaning of this canon. If that is what we meant, then this is a good object lesson in why the canon applies to "acts" (as its name suggests), not reasoning. If the canon allows us to conclude that Stathus authoritatively answered the question before us because its assumptions were necessary for its conclusion, then the canon does nothing but create logical fallacies. Positing an argument's premise in the conclusion as a means of proving the premise's truth is known as the petitio principii (or "begging the question") error. Bootstrapping does not make a premise more likely to be true. ¶ 92. The "Interpretation Principle" is similarly unhelpful. Yes, "[e]very application of a text to particular circumstances entails interpretation." Scalia & Garner, supra ¶ 5, at 53. But that truism requires an application of the text. As our opinion admits, however, the Stathus court didn't apply the text to the question in which we are interested. Thus, there is no interpretation for this canon to validate. So, even if we had the power to suspend the iron-clad law of non-contradiction, this brace of canons is no more helpful than the first. ¶ 93. As our opinion reveals, we don't have enough interpretive canons to make Stathus say something authoritative about the availability of attorney's fees under Wis. Stat. § 895.446(3)(b). We should be grateful this is so. For if our opinion is correct, and this cocktail of canons has the power to create ex nihilo, then we have called forth from our interstitial silences a host of undefined (and undefinable) authorities. Who knows what manner of inchoate precedent will answer that summons? Our responsibility (and authority) lies only in saying what the law is—that is, saying what it already is; it is not for us to use interpretive canons to speak the law into existence. Marbury v. Madison, 5 U.S. 137, 177 (1803). II. LEGISLATIVE INACTION ¶ 94. To affirm the continuing validity of Sta-thus's non-holding, our opinion observes that the legislature has done nothing to counter the court of appeals' assumption that Wis. Stat. § 895.446(3)(b) awards attorney's fees to prevailing plaintiffs: "[T]he legislature had ample opportunity to act on or repeal the judicial interpretation of 'costs of. . . litigation' in Stathus, particularly when it amended subsection (3)(b). . . . [b]ut the legislature did not act on or repeal the interpreted language." Majority op., ¶ 52. Accepting for the sake of argument that there was a "judicial interpretation" to which the legislature could respond, there is nothing to suggest the legislature's non-response could have anything to say about the statute. ¶ 95. As mentioned above, we look for a statute's meaning in its text, context, and structure. Kalal, 271 Wis. 2d 633, f ¶ 45-46. These are things that exist and have definable content, the meaning of which we may contest. Some would also include legislative history as a source of a statute's meaning—e.g., instructions delivered to the bill's drafter, iterations of a bill presented in committee or to the full legislative body, statements delivered by the members in a legislative chamber, et cetera. Regardless of the propriety of consulting such material, it at least shares with the statute's text the benefit of being something that exists; it has definable content to which construing minds might have recourse. ¶ 96. Legislative inaction, on the other hand, is a negation. There is no definable content in a void, and there can be no meaning drawn from it. There are several reasons this is true. ¶ 97. First, attributing significance to legislative inaction depends on an overweening, court-centric view of our relationship to the other branches of government. If this interpretive device is to function, it requires a belief that the legislature carefully attends to everything we say, rigorously compares our pronouncements to its own understanding of the statutory corpus,[5] compiles a list of disagreements, and privileges corrective measures over everything else on its crowded legislative calendar. ¶ 98. This, of course, hasn't the slightest correlation to reality. The legislature is a coordinate branch of government with its own unique responsibilities, functions, and priorities. It does not pay court to us, nor does it have the least obligation to do so. That it does, from time to time, adopt legislation specifically designed and intended to respond to one of our holdings gives us no license to pretend it will always do so when it disagrees with us. ¶ 99. Second, drawing an inference from legislative inaction involves an unwarranted temporal elision. The meaning of a statute is fixed at the point it is adopted. To the extent we are looking past the text to the legislature to determine what its membership thought the statute meant, we should at least look to the body that adopted it. The legislature does not have stagnant membership—it is, in fact, reconstituted every other year. Many legislators return, but the change of even one member makes it a new body. If we look for meaning in the inactivity of successive legislatures, then we are asking after the wrong body. This assumption [about the significance of legislative inactivity], which frequently haunts our opinions, should be put to rest. It is based, to begin with, on the patently false premise that the correctness of statutory construction is to be measured by what the current Congress desires, rather than by what the law as enacted meant. Johnson v. Transp. Agency, Santa Clara Cty. Cal., 480 U.S. 616, 671 (1987) (Scalia, J., dissenting). ¶ 100. Third, whether a court's interpretation of a statute should be rejected is a substantively different question from whether the statute should be adopted in the first instance: "To make matters worse, it [the legislative inaction principle] assays the current Congress' desires with respect to the particular provision in isolation, rather than (the way the provision was originally enacted) as part of a total legislative package containing many quids pro quo." Id. (emphasis omitted). There is no telling what might incentivize legislators to reject our statutory interpretations, or dissuade them from doing so. Nor do we have the means by which to compare those dynamics to the supporting rationale for the statute's provisions when adopted. ¶ 101. Finally, there are a variety of reasons the legislature may take no action on any given question. Because most of those reasons have nothing to do with the accuracy of our work, there simply isn't any way to espy meaning in the legislature's silence: But even accepting the flawed premise that the intent of the current Congress, with respect to the provision in isolation, is determinative, one must ignore rudimentary principles of political science to draw any conclusions regarding that intent from the failure to enact legislation. The 'complicated check on legislation,' The Federalist No. 62, p. 378 (C. Rossiter ed. 1961), erected by our Constitution creates an inertia that makes it impossible to assert with any degree of assurance that congressional failure to act represents (1) approval of the status quo, as opposed to (2) inability to agree upon how to alter the status quo, (3) unawareness of the status quo, (4) indifference to the status quo, or even (5) political cowardice. Id. at 671-72. Even if a majority of one of the succeeding legislature's members wished to rebuke our interpretation, that desire still might not result in a new law: "[IJntuiting those desires from congressional failure to act is an uncertain enterprise which takes as its starting point disregard of the checks and balances in the constitutional scheme of legislation designed to assure that not all desires of a majority of the Legislature find their way into law." United States v. Johnson, 481 U.S. 681, 703 (1987) (Scalia, J., dissenting). ¶ 102. This "legislative inaction" device has no explanatory power whatsoever, and we should not pretend it does. As Justice Scalia said, "I think we should admit that vindication by congressional inaction is a canard." Johnson, 480 U.S. at 672 (Scalia, J., dissenting). I do, too. f 103. Our opinion relies on it anyway because, well, that's what we do: "[The] concurrence/dissent takes issue with this canon of construction . . . but does not argue that Wisconsin law does not support application of the canon or that we have incorrectly applied the canon here." Majority op., f 51 n.20. Alas for the day in which exposing one of our analytical constructs as just make-believe doesn't diminish its authority. Notwithstanding the emptiness of this judicial fabrication, we are so humbled by it that we cannot even imagine challenging its place in our jurisprudence. Yes, our prior opinions support the use of this fiction. But reason doesn't. Between the two, we should choose the latter. We have both the authority and the responsibility to do so. f 104. Perhaps even more unsettling is our revelation that, without this fiction and a clutch of inap-posite canons, we would be unable to interpret our statutes: "In other words, the dissent has presented a problem without suggesting a solution, and we decline to digress from the established canons of construction because to do so would leave us with no intelligible, generally accepted and consistently applied theory of statutory interpretation." Majority op., ¶ 51 n.20 (internal quotations and citation omitted). We could always consult the statute's text, as Kalal teaches—a solution with which I introduced this opinion, and which I address below. III. THE STATUTE'S TEXT ¶ 105. After having already concluded that the statute shifts responsibility for attorney's fees to the defendant, our opinion finally turns to the statute's text to see what it might have to say for itself: "Furthermore, other language in the statute supports our conclusion that attorney fees are recoverable."[6] Majority op., f 61. "Other" language supports our conclusion? This suggests we had already construed some of the statute's language. We hadn't. Until this paragraph all we had done with the language was quote it. In any event, our analysis of the statute's language spanned a single paragraph. See id. And in that paragraph we simply recognized that: (1) attorneys act in an agency capacity with respect to their clients; and (2) the statute awards "the value of the time spent by any employee or agent of the victim" as a cost to the prevailing plaintiff. ¶ 106. While it is true that attorneys act in an agency capacity for their clients, it does not inexorably follow from this that the legislature means the term "agent" to encompass "attorney." And there is substantial evidence that it does not mean this. When the legislature wants a provision to apply to both attorneys and agents, it makes its intention known by actually saying it applies to both attorneys and agents. It has done this so consistently, and so broadly across the statutory corpus, that it has created a quite distinct pattern, a pattern our opinion does not acknowledge. See, e.g., Wis. Stat. §§ 19.05 ("the plaintiffs agent or the plaintiffs attorney"), 42.01 ("an authorized attorney or agent"), 59.40 ("the party's agent or the party's attorney"), 59.694 ("agent or attorney"), 60.06 ("agents, attorneys and representatives"), 60.351 ("agent or attorney"), 62.23 ("by agent or by attorney"), 66.0111 ("attorney or agent"), 66.0703 ("agents or attorneys"), 71.78 ("agent or attorney"), 73.01 ("petitioner's attorney or agent"), 76.30 ("person's authorized agent or attorney"), 77.61 ("person's authorized agent or attorney"), 87.12 ("engineers, attorneys, agents, assistants, clerks, employees and laborers"), 93.18 ("agent or attorney"), 100.23 ("his or her agent or attorney"), 102.123 ("employee's attorney or other authorized agent"; "employee, attorney, or agent"), 102.30 ("agent or attorney"), 102.33 (stating phrase "attorney or authorized agent" five times), 103.275 ("attorney or agent"; "person's attorney or agent"), 103.58 ("agents, servants, employees and attorneys"), 133.08 ("applicant's agent or attorney"), 115.997 ("officers, attorneys, employees, agents, or consultants"), 134.19 ("principal, agent or attorney"), 145.10 ("attorney or agent"; "person's attorney or agent"), 171.04 ("person's agent or attorney"), 171.05 ("person's agent or attorney"), 171.06 ("person's agent or attorney"), 181.1603 ("member's agent or attorney"; "agent or attorney"), 180.0720 (stating "shareholder or his or her agent or attorney" three times), 180.1602 ("agent or attorney"), 180.1603 ("shareholder's agent or attorney"), 185.47 ("any member or stockholder, or his or her agent or attorney"), 186.70 ("agent or attorney"), 193.501 ("member's agent or attorney"), 214.525 ("person, agent, or attorney"), 217.19 ("agent or attorney"), 221.0518 (stating "shareholder or his or her agent or attorney" three times), 279.07 ("interested persons or their agents or attorneys"), 280.13 ("attorney or agent"; "licensee's attorney or agent"), 304.16 ("officers, attorneys, employees, agents, or consultants"), 321.61 (stating "person's agent or attorney" three times; "person or agent or attorney"), 610.50 ("insurer or an employee, agent or attorney of an insurer"), 611.51 ("policyholder's agent or attorney"), 701.0802 ("agent or attorney of the trustee"), 757.30 ("person who appears as agent, representative or attorney"), 779.98 ("person's agent or attorney"), 799.45 ("plaintiffs attorney or agent"; "plaintiff or his or her attorney or agent"), 804.01 ("attorney, consultant, surety, indemnitor, insurer, or agent"), 814.245 ("attorneys or agents"), 815.53 ("creditor or his or her attorney, or agent"), 881.016 ("attorneys, accountants, investment advisers, agents or other persons"), 893.80 ("party, agent or attorney"), 893.82 ("his or her agent, attorney or personal representative"), 895.14 ("the party injured, agent or attorney"), 898.02 ("plaintiffs agent or attorney"), 898.03 ("plaintiffs agent or attorney"), 938.999 ("officers, attorneys, employees, agents, or consultants"), 946.13 ("director, officer, employee, agent or attorney"), 946.17 ("agent or attorney of any person"; "agent or attorney").[7] ¶ 107. If the term "agent" subsumes "attorney," there would have been no need to mention the latter on these 60 occasions. We should not shoehorn the term "attorney" into "agent" when the legislature so clearly does not. The statute, by its own terms, makes a defendant liable for the time value of the prevailing plaintiffs agents. But, for whatever reason, the legislature chose not to extend the statute's mandate to attorney's fees. Whether it should have done so is none of our business. ¶ 108. Even if this were an insufficient reason to reject our reading of the statute, the text provides an even more explicit reason to do so. One of the most respected principles of statutory construction is that we should not interpret text in a manner that reduces any of its language to ignominious surplusage. Kalal, 271 Wis. 2d 633, ¶ 46 ("Statutory language is read where possible to give reasonable effect to every word, in order to avoid surplusage."). We cannot understand "agent" as inclusive of "attorney" without violating that principle for the following reasons. ¶ 109. The statute under consideration actually contains two cost-shifting provisions. The first is general and applies to all causes of action authorized by Wis. Stat. § 895.446(1): "If the plaintiff prevails in a civil action under sub. (1), he or she may recover all of the following: .. . ." § 895.446(3). The second is specific, and applies only to a subset of claims authorized by the statute. This specific provision explicitly makes the defendant liable for the prevailing plaintiffs attorney's fees: "If the violation of s. 943.01(1) involves the circumstances under s. 943.01(2d), the court may award a prevailing plaintiff the reasonable attorney fees incurred in litigating the action ...."§ 895.446(3m)(b) .[8] ¶ 110. Our conclusion does irremediable damage to the text of the specific cost-shifting provision. If the general provision already includes attorney's fees, there is no reason for the specific provision to authorize a court to make such an award. That is to say, our understanding of the general provision makes the specific provision's award of attorney's fees entirely meaningless. But there is nothing about the statute or this case that requires us to cause that damage. If we don't stuff "attorney" into "agent" (which would be felicitously consistent with the legislature's choices), then the specific provision's award of attorney's fees will have good work to do. And we will have given "reasonable effect to every word," and left no surplus-age. We did not explain why we should ignore this internally-consistent reading of the statute. ¶ 111. Our opinion demonstrates an understandable fondness for canons of statutory construction. When carefully applied in applicable circumstances, they can powerfully illuminate a statute's meaning. Out of the many cited canons, however, perhaps the only applicable one is the presumption against legislative changes to the common law: "A statute will be construed to alter the common law only when that disposition is clear." Scalia & Garner, supra ¶ 5, at 318 (defining the "Presumption Against Change in Common Law"); see majority op., ¶ 51. In Wisconsin, we follow the "American Rule" with respect to attorney's fees: The general rule, known as the American rule, is that attorney's fees are not ordinarily recoverable in the absence of a statute or enforceable contract providing therefor. Each party to a lawsuit, under this theory, should bear its own costs of litigation. The American rule has been recognized and followed in Wisconsin. Kremers-Urban Co. v.Am. Emp'rs Ins. Co., 119 Wis. 2d 722, 744-45, 351 N.W.2d 156 (1984) (internal citations omitted). That's our common law. So if Wis. Stat. § 895.446(3)(b) is to alter that rule, it must do so clearly. We, however, derived our attorney's fees holding wholly from what we think we squeezed out of silence. That should make it self-evident that this statute did not "clearly" alter the common law. IV. CONCLUSION ¶ 112. We found the meaning of Wis. Stat. § 895.446(3)(b) in a court of appeals opinion that did not address the question we answered, a collection of inapposite interpretive canons, some policy arguments, and a canard. This is not how we are supposed to interpret statutes. And the methodology we employed led us to the wrong conclusion. Consequently, I respectfully dissent from that portion of our opinion. ¶ 113. I am authorized to state that Justice REBECCA GRASSL BRADLEY joins this opinion concurring in part and dissenting in part. "Authorization of an act also authorizes a necessary predicate act." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 192 (2012) (defining the "Predicate-Act Canon"). "Every application of a text to particular circumstances entails interpretation." Id. at 53 (defining the "Interpretation Principle"). The law of non-contradiction holds that a proposition cannot be simultaneously true and not true. Aristotle, Metaphysics bk. IV, ch. VI, at 1011b (W.D. Ross, trans., Oxford, Clarendon Press 1908) (c. 350 B.C.E.) (stating that "the most indisputable of all beliefs is that contradictory statements are not at the same time true"). Thus, the Stathus court cannot have both: (1) assumed this statute awards attorney's fees; and also (2) engaged in a process of discovery and exposition on that subject. The legislature does not actually have a collective understanding of a statute's meaning. A legislature is not a monolith; ours is a body that comprises 132 members, all of whom exercise their mental faculties independently of the others. So to speak of a collective understanding is to speak of a fiction. We reached our conclusion as early as ¶ 49; our treatment of the statute's language did not start until ¶ 61. Two of these statutes, Wis. Stat. §§ 60.06 and 814.245, are fee-shifting provisions, demonstrating that even in this context the legislature makes a distinction between "attorneys" and "agents." All of these statutes refer to the current 2015-16 version. The type of property damage to which this provision refers is not at issue in this case.