**Helen M. KATTA, as Special Administrator for the Estate of Thaddeus C. Katta, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 87 C 10815.

United States District Court, N.D. Illinois, E.D.

Sept. 30, 1991.

---

David J. Magee, Magee, Collins and Lodge, James F. Sullivan, Brian M. Collins, Chicago, Ill., for plaintiff.

Gillum Ferguson, Terry M. Kinney, Asst. U.S. Attys., for defendant.

## MEMORANDUM OPINION AND ORDER

HOLDERMAN, District Judge:

Plaintiff Helen M. Katta, as special administrator for the estate of her son, Thaddeus ("Ted") C. Katta, brings this suit under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* ("FTCA"). Plaintiff seeks damages arising from the tragic death of her son.

Before filing this action, plaintiff submitted her claim to the Veterans' Administration ("VA") Medical Center, North Chicago, Illinois. That agency denied her claim in writing, satisfying the requirements of 28 U.S.C. Section 2675.

Accordingly, plaintiff filed this action against defendant, the United States of America ("the Government"), on December 23, 1987. Plaintiff bases jurisdiction on 28 U.S.C. Section 1346(b).

After thorough pre-trial discovery, this case was tried to the court. Although the tragic facts of this case evoke great sympathy for the decedent and his family, for the reasons stated below the court must rule in favor of the Government.

## I. FINDINGS OF FACT [1]

In February of 1969, at the age of twenty, Ted Katta enlisted in the United States Army. (H. Katta Tr. 7, 15.) At the time he was five feet eight or nine inches tall. He weighed 185 pounds and he had no physical impairments. (H. Katta Tr. 15–16.)

Ted Katta served in Vietnam for approximately one year. While there, Mr. Katta received gun shot wounds resulting in injuries to his right hip, right arm, and right shoulder. (H. Katta Tr. 17.) When he returned from Vietnam in 1970, Ted Katta weighed about 120 pounds. (H. Katta Tr. 16; T. Katta Tr. 3.) His mother did not even recognize him. (H. Katta Tr. 16.) The Army honorably discharged Ted Katta in 1971. He received a Combat Infantryman's Badge for his service.

After his discharge, Ted Katta refused to discuss his experiences in Vietnam with anyone. (H. Katta Tr. 20; T. Katta Tr. 4, 8.) He appeared to have a lot of anger and hate "in his eyes." (T. Katta Tr. 4.)

In May of 1971, Ted Katta married Tanina ("Tina") Piavenko. (H. Katta Tr. 21; T. Katta Tr. 2, 4.) Several months later, Ted and Tina Katta moved into a home of their own in the town of McHenry, Illinois. (H. Katta Tr. 22; T. Katta Tr. 6.) The couple had two children: a daughter, Deneen, born in 1974; and a son, Bryant, born in 1975. (T. Katta Tr. 6.)

Beginning in 1975 and 1976, Ted Katta started to have nightmares.[2] (T. Katta Tr. 6–7.) On more than one occasion Ted, while sleeping, got up from the bed moaning, slung his wife Tina over his shoulder

and shouted, "Don't worry, Mike, everything's okay, I got you, I got you." (T. Katta Tr. 7, 15–16.) In 1976 Ted Katta began drinking alcoholic beverages more and more.[3] (T. Katta Tr. 6, 8.)

By 1980 Ted Katta's marriage was deteriorating. He was drinking even more, staying up at night more, and not sleeping. (T. Katta Tr. 19.) He began to physically and verbally abuse Tina. (T. Katta Tr. 19, 23.)

During 1981 and 1982 Ted Katta was not working much. (T. Katta Tr. 23.) He would sleep on the couch during the day and not sleep much at night. (T. Katta Tr. 23–24.) At night Ted would sit in the family room of his home with the lights off or walk around the house. (T. Katta Tr. 24.) He kept two guns, a rifle, and a hunting knife with seven inch blade in the bedroom "for protection." (T. Katta Tr. 24–25.) His physical abuse of his wife intensified. (T. Katta Tr. 25, 27–28.)

On three occasions, Ted Katta sat on the couch in his home, dressed in battle fatigues, having blacked-out his face with grease paint. (T. Katta Tr. 25–26.) He would often laugh in a "shrieking" manner. (T. Katta Tr. 26.)

It was this strange behavior which brought Ted Katta into contact with the VA in 1982. The VA operates the Veteran's Administration Medical Center, North Chicago, Illinois ("North Chicago VA"). On February 3, 1982, James Moore, a social worker at the North Chicago VA, examined Ted Katta. Mr. Moore diagnosed Ted as suffering from Post Traumatic Stress Disorder ("PTSD") stemming from his combat experiences in Vietnam. (Moore Tr. 7–8, 23–24, 29.) Dr. M.K. Mitchell, a staff psychiatrist, signed Mr. Moore's diagnosis.

In February of 1982 Ted Katta was examined at the North Chicago VA and placed on Outpatient Ambulatory Care.

---

**1.** All facts without citations to the record are uncontested by the parties. (*See* Final Pre–Trial Order, Uncontested Facts.)

**2.** Before serving in Vietnam, Mr. Katta had no sleeping problems or nightmares. (H. Katta Tr. 54–55.)

**3.** Before he went to Vietnam Ted Katta had no drinking problems. (T. Katta Tr. 3.)

Mr. Katta was discharged from Outpatient Ambulatory Care on August 5, 1982, after repeatedly failing to keep scheduled appointments at the VA Mental Health Clinic.

On December 10, 1982, Ted Katta attempted to choke his wife, Tina, and threatened to kill her. Tina left her husband, taking the children, after that incident. (T. Katta Tr. 31.)

In July of 1983, Mr. Katta moved out of his marital home in McHenry, Illinois, and Tina and the children moved back into the home. (T. Katta Tr. 34–35.) Mr. Katta moved in with his elderly parents—Helen Katta and her husband—who lived in Chicago, Illinois. He did not speak to Tina. She did not speak to him. (T. Katta Tr. 35.)

In December of 1983 Ted and Tina Katta were divorced. (T. Katta Tr. 2, 29, 33.) Tina Katta testified that she was afraid of Ted and of what he might do to her or to their children. (T. Katta Tr. 33, 40, 43, 57.)

After Ted Katta moved in with his parents, Helen Katta noticed that her son had a "very strange laugh." He would not talk with her. He had repeated nightmares where he would scream during the night. (H. Katta Tr. 24.)

Indeed, several times each week, Ted Katta would awaken during the night, jump up, and run down his parents' hallway swinging a black scarf he had brought back with him from Vietnam. (H. Katta Tr. 25–26.) He would then sleep on his parents' living room floor. (H. Katta Tr. 27.) Ted Katta often would become violent, throwing items and laughing "like a madman". (H. Katta Tr. 27–28.)

Near Easter of 1984 Ted Katta threatened to choke his mother. (H. Katta Tr. 29.) At one point he grabbed her around the neck. (H. Katta Tr. 29.) He also began verbally abusing his mother. (H. Katta Tr. 30.) In early 1984 Ted Katta attempted to break into his ex-wife's home in McHenry. (T. Katta Tr. 36.)

On October 22, 1984, Helen Katta signed a Petition for Involuntary Admission of Ted Katta because he had tried to choke his father and had broken windows in his parents' home on October 18, 1984. Chica-go Police brought Ted Katta to the Chicago Read Mental Health Center ("Chicago Read") on October 23, 1984 under a Writ of Detention. Mr. Katta was confined for examination and a hearing.

On October 30, 1984 after a hearing, the Circuit Court of Cook County entered an order involuntarily committing Ted Katta as "in need of mental treatment." Ted Katta was hospitalized at Chicago Read from October 23, 1984 until November 30, 1984.

Ted Katta's treating psychiatrist at Chicago Read was Dr. A. Papas, M.D. Dr. Papas diagnosed Mr. Katta as suffering from a disorder known as Paranoia, which Dr. Papas believed to be in partial remission by November 30, 1984. Ted Katta was transferred to the North Chicago VA on November 30, 1984. Dr. Papas signed Ted Katta's Chicago Read discharge summary, which was sent to the North Chicago VA with Ted Katta.

Following Ted Katta's arrival at the North Chicago VA on November 30, 1984, Dr. Falies Munas, a staff psychiatrist at the VA Mental Health Clinic, examined and evaluated him. While at Chicago Read Ted Katta had been on a medication known as Mellaril for his paranoid disorder. Dr. Munas prescribed Mellaril at a lower dosage. Dr. Munas then placed Ted Katta on outpatient ambulatory care status.

Dr. Munas' psychiatric evaluation reflects that Ted Katta was in partial remission without any suicidal thoughts, and that there was no history suggestive of major depression or mania. As part of his outpatient treatment, Ted Katta attended appointments with Dr. Munas in North Chicago on December 7 and December 20, 1984, and January 3, 1985.

After he was placed on outpatient status on November 30, 1984, Ted Katta returned to his parents' home in Chicago. His condition had improved markedly. (H. Katta Tr. 48; T. Katta Tr. 39, 48.) He spoke several times with his ex-wife, Tina, saw her and his children during the Christmas holidays, and was pleasant to his family. (T. Katta Tr. 38, 48.) He appeared much better—he was dressing better, was taking pride in his

appearance, and had a more positive attitude. (T. Katta Tr. 48–50.)

On December 7, 1984 Dr. Munas found Ted Katta to be in nearly full remission. On December 20, 1984 and January 3, 1985, Dr. Munas found Ted Katta to be in full remission. Accordingly, on January 3 Dr. Munas changed the schedule of Ted Katta's visits to once per month. Ted Katta's next appointment with Dr. Munas was scheduled for January 31, 1985.

According to Tina Katta, after December of 1984 Ted Katta indicated that he was not going back to the VA. He had stopped taking his medication. (T. Katta Tr. 50–51.) It was after Ted Katta stopped taking his medication and stopped going back to the VA that his condition began to worsen. (T. Katta Tr. 51.) Tina Katta admitted that her ex-husband had a pattern of beginning treatment and other activities, and then repeatedly dropping out.[4] (T. Katta Tr. 51–54.)

On January 9, 1985 Dr. Sumner Garte, a vocational psychologist, interviewed Ted Katta. Dr. Garte referred Mr. Katta to see Jerry Pence, an employee of the Illinois Disabled Veteran's OutPatient Placement on January 10 and 23, 1984. A progress note relating to Ted Katta, dated January 10, 1985, signed by Mr. Pence, was part of Dr. Garte's file.

On January 16, 1985 Ted Katta went to the Central Testing Unit at the North Chicago VA for psychological and vocational testing.

On January 22, 1985, Claire Cafaro, a social worker, interviewed Ted Katta. Ms. Cafaro found that Ted Katta presented himself somewhat guardedly and did not acknowledge the need for treatment other than job counseling. Ted Katta also expressed to Ms. Cafaro his wish not to return for further treatment. In fact, he asked whether he had to keep coming to the VA. Also on January 22, 1985, Dr.

Aldo Santorum, a psychologist, conducted a psychological evaluation of Ted Katta.

In January of 1985 Helen Katta was aware that her son's behavior was beginning to deteriorate. (H. Katta Tr. 48.) His nightmares, screaming, and running up and down the hallway had started again. (H. Katta Tr. 49.) He began breaking things again. (H. Katta Tr. 50.) He appeared to have stopped taking his medication. (H. Katta Tr. 66.) Ted's ex-wife, Tina, also noted that Ted was back to his "same horrible self." (T. Katta Tr. 45.)

Neither Helen nor Tina Katta informed anyone at the VA of Ted's worsening behavior. (T. Katta Tr. 51.) Indeed, after his interview and evaluation at the North Chicago VA on January 22, 1985, neither Ted Katta nor his parents ever sought the help of the medical staff of the VA or Chicago Read.

Ted Katta failed to appear for his appointment with Dr. Munas on January 31, 1985. On February 15, 1985, Dorothy Haymes, a case management technician in counselling psychology, called Ted Katta to inquire whether he planned to return for further counseling. Ms. Haymes' note of that same day reflects that Ted Katta did not wish to return for further counseling appointments and that he was looking for work.

On February 21, 1985, Dr. Garte sent Ted Katta a letter along with a questionnaire about the Counseling Psychology Service, of which Dr. Garte was chief. The North Chicago VA has no record that Ted Katta responded to that letter or questionnaire.

On February 28, 1985 Ted Katta again failed to appear at his scheduled appointment with Dr. Munas at the North Chicago VA. On March 27, 1985 Ted Katta failed to appear yet again for his scheduled appointment with Dr. Munas. On March 28, 1985, Dr. Munas signed a note discharging

---

**4.** For example, Ted Katta went with Tina to a marriage counselor at Lutheran General Hospital. He dropped out. Ted went with Tina to a marriage counselor in Crystal Lake. He dropped out. Ted attended Alcoholics Anonymous. He dropped out. He went to the VA for counseling sessions for a while. He dropped out. He went to the VA for actual medical treatment in 1982. Again, he dropped out. (T. Katta Tr. 51–53.)

Ted Katta from clinic status because of his refusal to appear for appointments.[5]

In the spring of 1985, Ted Katta repeatedly tore up mail he received from the VA without reading it. Although Helen Katta knew of this behavior, she did not inform anyone at the VA. Tina Katta also failed to notify the VA that her ex-husband's condition was worsening. (T. Katta Tr. 51.)

By late July of 1985, Ted Katta's condition had deteriorated substantially. (H. Katta Tr. 85.) He had become abusive and threatening again both to his parents and to his ex-wife, Tina. (H. Katta Tr. 85–86; T. Katta Tr. 42–43.) In fact, Helen Katta saw the same symptoms again in her son that had led her to have him involuntarily committed to Chicago Read in October of 1984. (H. Katta Tr. 86.)

During the period between 1982 and 1985, when Ted Katta was living with his parents, his three sisters never offered to do anything to help him. Helen Katta never suggested that his sisters help him. (H. Katta Tr. 83.)

Toward the end of July, 1985, Helen Katta and her husband took a three-week trip to a property they owned in Arizona. (H. Katta Tr. 57–58, 86.) Ted Katta stayed at his parents' home in Chicago, alone. (H. Katta Tr. 58, 87.) Before Ted Katta's parents left for Arizona, Ted repeatedly asked Helen Katta how long she would be gone and when she would be coming home. (H. Katta Tr. 87–88.)

Although Helen Katta had no telephone at her Arizona property, she gave her three daughters a telephone number where she could be reached in Arizona. She did not give the number to Ted Katta, but believed his sisters had given him her phone number. (H. Katta Tr. 58–59, 88.)

While his parents were in Arizona, Ted Katta called his daughter, Deneen, who was living with her mother in McHenry, Illinois. Ted Katta asked Deneen to come spend a week with him in Chicago. She refused.

On August 8, 1985, Ted Katta called his son, Bryant, who also lived with Tina Katta in McHenry. He asked Bryant and his sister to spend the weekend with him. Bryant told him that they had other plans.

On August 9, 1985 Ted Katta's parents returned from Arizona. (H. Katta Tr. 59.) They had not spoken with Ted for the entire three weeks they were gone.[6] (H. Katta Tr. 58–59, 88.)

Helen Katta and her husband arrived at their home on August 9 at 6:30 p.m. When they greeted their son, he did not respond. A short while later he stormed out of the house. (H. Katta Tr. 59.)

Ted returned a short while later. He then left the house and returned again two more times. (H. Katta Tr. 60.) Ted Katta left the house one last time. (H. Katta Tr. 60.) Helen Katta never saw him again. (H. Katta Tr. 61.)

That same evening, at approximately 11:30 p.m., Ted Katta walked into the path of a Chicago Northwestern commuter train near the intersection of the 4200 block north and the Kennedy Expressway in Chicago. He died from that collision.

## II. DISCUSSION

The Government makes several arguments as to why the VA cannot be held

---

**5.** North Chicago VA policy concerning setting appointments is as follows: when a veteran has his initial appointment at the mental health clinic, he is given a small, pocket-sized appointment card. Future appointments are given directly to the veteran and written on his appointment card which remains in the veteran's possession. Should the veteran fail to keep his appointment, another appointment is made by the clerk, and a written notice of the new appointment is sent by mail to the veteran after the veteran misses the first appointment.

This process is done for two succeeding appointments, and should the veteran fail those appointments, he or she is automatically dis-

charged from the clinic. Discharge is a formal procedure which allows the hospital to close the file and does not affect the veteran's eligibility for further treatment. The patient is not notified of this discharge by personnel of the North Chicago VA. (Final Pre–Trial Order, Statement of Uncontested Facts, ¶ 26.)

**6.** Helen Katta testified that she tried calling her son, but "A lot of times he would not answer the phone, most of the time, so I never got him by phone." (H. Katta Tr. 58.) Ted Katta never reached his parents while they were in Arizona. (H. Katta Tr. 59.)

liable for Ted Katta's death. The court finds either one of two dispositive: (1) based upon the facts brought out at trial, the *Feres* doctrine deprives this court of subject matter jurisdiction over this case; and (2) even if the *Feres* doctrine were no bar to plaintiff's claim, plaintiff has failed to prove by a preponderance of the evidence that the VA's alleged negligence proximately caused Ted Katta's death.[7] The court discusses each of these issues below.

### A. *The Feres Doctrine*

■  In *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), the Supreme Court created an exception to the limited waiver of sovereign immunity contained in the FTCA. The Court held that "the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." *Id.,* 340 U.S. at 146, 71 S.Ct. at 159. The *Feres* doctrine bars suits by servicemembers against the Government even if the alleged negligence is by civilian employees of the federal government, as opposed to alleged negligence on the part of members of the military. *United States v. Johnson,* 481 U.S. 681, 686–88, 107 S.Ct. 2063, 2066–67, 95 L.Ed.2d 648 (1987).

In this case the court finds that Ted Katta's death arose out of his post-traumatic stress disorder—a disorder brought on as a result of Mr. Katta's military service in Vietnam. Accordingly, the *Feres* doctrine precludes any liability for Ted Katta's death which the Government otherwise might bear.

---

**7.** Because the court finds either of these two bases sufficient, the court need not (and does not) reach the issue of whether the "discretionary function" exception to the FTCA insulates the Government from liability here.

**8.** In addition to diagnosing Mr. Katta as suffering from PTSD, Mr. Moore described Mr. Katta as:

> ... a combat Vietnam Veteran who reacts to current stress with difuse [sic] hostile impulses, fear of aggressive acting out and isolation from possible support on an interpersonal basis, including his wife. He reports intru-

At trial plaintiff proved that Ted Katta suffered from PTSD. Plaintiff first presented the testimony of James L. Moore, the social worker at the North Chicago VA (Moore Tr. 2–3) who interviewed Ted Katta on February 3, 1982. (Moore Tr. 6.) On Ted Katta's application for treatment, Mr. Moore concluded that Ted Katta was suffering from PTSD.[8] (Moore Tr. 7–8; Pl.Ex. 3 at G000433.) Dr. Helen Mitchell, a staff psychiatrist at the North Chicago VA, signed the medical certificate containing Mr. Moore's diagnosis of PTSD. (Moore Tr. 8–9; Pl.Ex. 3 at G000433.)

At trial, Mr. Moore did not change his diagnosis that Ted Katta suffered from PTSD. Over the ten year period that Mr. Moore had been working at the North Chicago VA prior to diagnosing Ted Katta, Mr. Moore had been involved with hundreds of cases of PTSD. (Moore Tr. 10.) Indeed, between diagnosing Ted Katta on February 3, 1982 and trial, Mr. Moore had seen over five hundred more cases of individuals with PTSD. (Moore Tr. 10.) This court found Mr. Moore's testimony relating to Ted Katta's PTSD both reliable and credible.

Plaintiff's medical expert, Dr. Donald G. Langsley, also testified that Ted Katta suffered from PTSD. (Langsley I Tr.[9] 78; Langsley II Tr.[10] 18, 55.) Specifically, Dr. Langsley testified that on November 30, 1984, when Ted Katta was transferred to the North Chicago VA, Mr. Katta suffered from PTSD. (Langsley I Tr. 83.) Dr. Langsley further testified that up until his death, Ted Katta's history of PTSD was a factor which made him a potential suicide candidate. (*See, e.g.,* Langsley II Tr. 72.) Dr. Langsley based his opinions in part on

> sive memories of his combat experience, dreams and hostility at current events he relates to government injustice to veterans. He has no insight with respect to his impulses and his judgment re: his dissatisfaction is severely impaired.

(Moore Tr. 7–8; Pl.Ex. 3, at G000433–432.)

**9.** "Langsley I Tr." refers to the October 26, 1989 transcript of Dr. Langsley's testimony.

**10.** "Langsley II Tr." refers to the April 11, 1990 transcript of Dr. Langsley's testimony.

a Veterans Administration Rating Decision stating that Ted Katta was suffering from PTSD at the time of his death.[11] (Langsley I Tr. 63; Pl.Ex. 6 at CF000038.)

In addition to proving that Ted Katta suffered from PTSD, plaintiff proved by a preponderance of the evidence that Ted Katta's PTSD was a result of his combat experience in Vietnam. For example, Mr. Moore testified that Ted Katta's combat experience in Vietnam was the stressor that evoked his PTSD. (Moore Tr. 23–24, 29.) Similarly, Dr. Langsley testified that Ted Katta's PTSD stemmed from his experiences in Vietnam. (Langsley I Tr. 83.) Accordingly, the court finds that Ted Katta's PTSD arose out of an activity incident to service—namely, his traumatic Vietnam War combat experiences.

Finally, this court finds that Ted Katta's death was a suicide resulting from his PTSD. Dr. Langsley testified that in wounded Vietnam war veterans PTSD may last "for years and years and years, indeed for a lifetime." (Langsley II Tr. 56.) Dr. Langsley identified Ted Katta's PTSD as one of the risk factors which would make Ted Katta a potential suicide candidate. (Langsley II Tr. 72.) Again, Dr. Langsley based his opinion that Ted Katta's death was suicide in part on the Veterans Administration Rating Decision which concluded that Ted Katta killed himself.[12] (Langsley I Tr. 63; Pl.Ex. 6 at CF000038–39.)

Mr. Katta's behavior corroborates the court's conclusion that Mr. Katta committed suicide because of PTSD stemming from his Vietnam combat experiences. Ted Katta's combat experiences were undisputedly traumatic. He received multiple gun shot wounds, resulting in injuries to his right hip, right arm, and right shoulder.

He lost sixty five pounds during the approximately one year he was in Vietnam. Indeed, his physical condition was so changed that his mother did not even recognize him when he returned home.

After his discharge from military service, Mr. Katta refused to discuss his experiences in Vietnam with anyone. He appeared to harbor much understandable anger and hatred about the experience.

Although Ted Katta had no sleeping problems before he went to Vietnam, after returning home he started to have violent nightmares—nightmares relating to his combat experiences.[13] For example, more than once he slung his wife Tina over his shoulder while the two of them were sleeping in bed and shouted, "Don't worry, Mike, everything's okay, I got you, I got you." (T. Katta Tr. 7, 15–16.) At night he would sit alone in his home, with the lights off—sometimes dressed in combat fatigues and face paint. After he moved in with his parents, Mr. Katta continued such conduct, repeatedly awakening during the night and running down the hallway waving a black scarf he had brought back with him from Vietnam.

By late July of 1985—a few weeks before his death—Ted Katta's condition was much the same. He was exhibiting the same extreme behavior that had lead his mother to involuntarily commit him in 1984. A few weeks later Ted Katta walked into the path of a Chicago Northwestern commuter train, killing himself.

These facts, combined with the medical diagnoses of Mr. Moore and Dr. Langsley, convince this court that Mr. Katta committed suicide on August 9, 1985, as a result of PTSD stemming from his combat experiences in Vietnam.[14] Because the court

---

**11.** Because of hearsay concerns, the court considered the VA's Ratings Decision not for the truth of the matter asserted, but as evidence of the facts or data upon which Dr. Langsley based his expert opinion. (Fed.R.Evid. 703; Langsley I Tr. 66.)

**12.** *See* footnote 11, above.

**13.** Ted Katta also had no drinking problems prior to his service in Vietnam. He drank progressively more after his return.

**14.** The court's finding that Mr. Katta suffered from PTSD is not a finding that Dr. Munas was negligent in failing to diagnose Mr. Katta as having PTSD. For the reasons stated below, the court need not reach the issue of the Government's negligence in failing to further treat Mr. Katta. In any event, the court believes that plaintiff failed to prove negligence on the part of the defendants' VA personnel.

finds that Ted Katta's death arose out of the PTSD caused by his service in Vietnam, the *Feres* doctrine divests this court of subject matter jurisdiction over this case. *Feres*, 340 U.S. at 146, 71 S.Ct. at 159.

Plaintiff's argument that this case does not implicate the policies underlying the *Feres* doctrine and thus is not barred by it is unavailing. Allowing claims like plaintiff's to proceed would risk "involv[ing] the judiciary in sensitive military affairs at the expense of military discipline and effectiveness." *Johnson*, 481 U.S. at 690, 107 S.Ct. at 2069, *quoting United States v. Shearer*, 473 U.S. 52, 59, 105 S.Ct. 3039, 3044, 87 L.Ed.2d 38 (1985). Lawsuits based upon suicides caused by military combat experiences necessarily implicate the military judgment and decisions of officers like those who commanded Ted Katta. Such military decisions are inextricably intertwined with the conduct of military missions. The integrity of such military decisions are expressly protected by the *Feres* doctrine. *Id; see also Rogers v. United States*, 902 F.2d 1268, 1271–72 (7th Cir. 1990).

Plaintiff cites *United States v. Brown*, 348 U.S. 110, 75 S.Ct. 141, 99 L.Ed. 139 (1954) for the proposition that the *Feres* doctrine does not bar her suit. The plaintiff in *Brown* brought suit under the FTCA for damages resulting from negligence in the treatment of his left knee in a VA Hospital. *Id.*, 348 U.S. at 110, 75 S.Ct. at 142. Plaintiff had injured his knee while on active military duty. The VA allegedly negligently treated the knee (by using an apparently defective tourniquet) six years after plaintiff had been honorably discharged from military service. *Id.*

The Supreme Court in *Brown* held that the *Feres* doctrine did not bar suit by the plaintiff. The Court in *Brown* based its decision, however, upon the fact that the negligent act giving rise to the injury—application of a defective tourniquet—was not incident to military service. *Id.*, 348 U.S. at 113, 75 S.Ct. at 144.

Unlike in *Brown*, in this case Ted Katta's death arose out of the course of his military duty—specifically, as a result of the PTSD caused by Ted's service in Vietnam. Plaintiff argues that the VA failed properly to diagnose and treat Ted Katta and it was that "negligent act"—like the defective tourniquet in *Brown*—which caused Ted Katta's death. As discussed below, however, the court finds that even if the VA's decisions relating to Mr. Katta were negligent (which the court does not find), plaintiff has failed to prove by a preponderance of the evidence that such negligence proximately caused Mr. Katta's death. Accordingly, the facts of *Brown* are inapposite here.

Plaintiff also cites *Cortez v. United States*, 854 F.2d 723 (5th Cir.1988) in urging that the *Feres* doctrine does not preclude her suit. *Cortez* involved a decedent who, because of severe mental disorders, had been placed on the Temporary Disability Retired List—a military status for servicepersons separated from the Army but whose final status is deferred pending additional medical evidence. *Id.*, 854 F.2d at 724. The decedent in *Cortez* ultimately was hospitalized in an army medical center, where he was allegedly left unattended in an eighth floor room. *Id.* The decedent jumped from the window of his hospital room to his death. *Id.*

The district court granted the government's motion to dismiss pursuant to the *Feres* doctrine. *Id.* The Fifth Circuit Court of Appeals reversed, holding that as a matter of law a member of the armed forces carried on the Temporary Disability Retire List is not, as a consequence of that status, prevented by the *Feres* doctrine from bringing an action under the FTCA. *Id.*, 854 F.2d at 726.

Like *Brown*, however, *Cortez* is inapplicable here. The court in *Cortez* simply held that servicemembers are not barred from recovering from the Government solely by virtue of being placed on the Temporary Disability Retired List. Indeed, because *Cortez* involved reversal of a grant of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court in *Cortez* never reached the issue of whether decedent's death in fact arose out of activity incident to service, as Ted Katta's

did. It was also unclear whether the hospital's alleged negligence was the proximate cause of decedent's death. Accordingly, *Cortez* is unhelpful in resolving the issues of this case.

■ The lesson of *Brown* and its progeny is that when the injury for which a serviceperson brings suit occurs *after* discharge, when the serviceperson is no longer on active duty or subject to military discipline, a suit for damages resulting from that injury is not necessarily barred by the *Feres* doctrine. *Brown*, 348 U.S. at 112, 75 S.Ct. at 143. In this case, however, the relevant injury is Ted Katta's PTSD—an injury caused by Ted Katta's combat experiences in Vietnam. Thus, this case is barred by *Feres*.

The court's holding in *Laswell v. Brown*, 683 F.2d 261 (8th Cir.1982), is instructive. *Laswell* involved a decedent who was exposed to radiation during atomic tests while a serving in the military. After decedent died of Hodgkins Disease, plaintiffs brought suit against the United States. Plaintiffs alleged that the government negligently failed to warn of radiation hazards and failed to treat decedent for radiation exposure. In finding plaintiffs' claim barred by the *Feres* doctrine, the court in *Laswell* stated:

> In *[United States v.] Brown*, there was an affirmative negligent action after discharge—the misuse of the tourniquet. In the case at bar and in *Thornwell [v. United States*, 471 F.Supp. 344 (D.D.C.1979)]*, the wrongful act [exposure to radiation] occurred while the plaintiff was a member of the armed forces. It is only the government's failure to remedy or, with medical treatment, to limit the damage inflicted while the plaintiff was in the service that leads to a claim for relief.

*Id.* at 267.

As in *Laswell*, in this case the allegedly wrongful act—Ted Katta's combat experiences resulting in his PTSD—occurred while Ted Katta was a member of the armed forces. Although Ted Katta did not kill himself until long after his discharge from the military, his suicide nonetheless resulted from his service-related PTSD. Accordingly, the court finds that the *Feres* doctrine divests this court of subject matter jurisdiction over plaintiff's claim. Judgment must be entered in favor of defendant.

### B. *Plaintiff's Failure to Prove Proximate Causation*

Even if this court had subject matter jurisdiction over plaintiff's claim, plaintiff has failed to prove by a preponderance of the evidence that the VA's alleged negligence proximately caused Ted Katta's death.

■ To establish medical malpractice by the VA, plaintiff must prove the following: (1) the standard of care by which the physician's treatment is measured; (2) a deviation from that standard; and (3) that the deviation proximately caused the plaintiff's injury. *Ramos v. Pyati*, 179 Ill.App.3d 214, 128 Ill.Dec. 290, 534 N.E.2d 472, 475 (1st Dist.1989).

The court finds that plaintiff has failed to prove the third essential element of her claim—that the VA's alleged negligence proximately caused Ted Katta's death. Accordingly, the court need not discuss at length the issue of whether the VA's conduct deviated from the standard of care. Nonetheless, because the court believes that the VA's decisions relating to Ted Katta were not negligent, a brief discussion of the issue of negligence is warranted.

#### 1. *Alleged Negligence*

Plaintiff asserts several bases for her conclusion that the VA was negligent in treating (and failing to treat) her son. Specifically, plaintiff argues that the VA was negligent because:

(1) Dr. Munas allegedly examined Ted Katta for only fifteen minutes on November 30, 1984 before deciding to reduce his medication and release him;

(2) Dr. Munas reduced Ted Katta's medication, Mellaril, from 600 to 400 mg. a day on November 30, 1984;

(3) Dr. Munas failed to determine that Ted Katta had been diagnosed as having PTSD in 1982;

(4) Dr. Munas examined Ted Katta on December 7 and December 20 of 1984 and January 3 of 1985 on an outpatient basis only;

(5) the VA failed to do more than it did [15] when Ted Katta failed to keep appointments with Dr. Munas—appointments scheduled for January 31, February 28, and March 27 of 1985.

(6) the VA discharged Ted Katta from clinic status because of his refusal to appear for appointments.

The court does not believe that the action or inaction by the VA constitutes negligence.

First, plaintiff complains about the length of Dr. Munas' initial examination of Ted Katta. Plaintiff contends that Dr. Munas examined Ted Katta for only fifteen minutes on November 30, 1984 before deciding to reduce his medication and release him.

Plaintiff bases her allegation on a marking of "2:30 p.m." in a note of nurse Harriett Stein and a marking of "3:00 p.m." in a note of Dr. Munas on November 30. (Pl.Ex. 3, at G000457, G000459.) According to the testimony of nurse Stein, however, Dr. Munas examined Ted Katta *before* she did. (Stein Tr. 14–15, 35.) Plaintiff makes much of this inconsistency.

Based upon the content of the relevant notes and the testimony at trial, however, it is unclear precisely what time Dr. Munas and nurse Stein examined Mr. Katta. Most likely, either Dr. Munas or nurse Stein mistakenly wrote down a wrong time or simply approximated the time of his or her examination of Ted Katta. (*See, e.g.,* Stein Tr. 35.)

Despite this discrepancy, the court finds persuasive Dr. Munas' credible testimony that it was his usual practice to conduct an initial examination on patients for approximately one hour and follow-up examinations for about thirty minutes. (Munas Tr. 73–74.) Plaintiff's expert, Dr. Langsley, testified that visits of these lengths were appropriate.[16] (Langsley I Tr. 21, 26.) Accordingly, plaintiff has failed to demonstrate that the length of Dr. Munas' examinations of Ted Katta constituted negligence.

Second, plaintiff claims that Dr. Munas negligently reduced Ted Katta's daily dosage of the medication Mellaril from 600 to 400 mg. on November 30, 1984. However, the Government's expert, Dr. William Scheftner, testified that 400 mg. of Mellaril is the minimum therapeutic dose for treating someone with psychotic symptoms. (Scheftner I Tr.[17] 29.) Although Dr. Langsley disagreed (Langsley I Tr. 78), Dr. Scheftner testified that this level of medication was appropriate and conformed to the standard of care in the community. (*Id.* 29–30.) Dr. Scheftner's testimony is convincing, especially given Ted Katta's improved condition at the time of treatment (Munas Tr. 70) and the dangerous and sometimes irreversible side effects of Mellaril which both experts acknowledged. (Munas Tr. 112–13; Langsley II Tr. 79.) [18]

Third, plaintiff contends that Dr. Munas negligently failed to determine that Ted Katta had been diagnosed by Mr. Moore as having PTSD in 1982. However, plaintiff failed to establish that Dr. Munas never reviewed the record of Ted Katta's 1982 VA contact at the time he examined

---

**15.** *See* footnote 5, above, for the North Chicago VA policy concerning setting appointments.

**16.** Even if Dr. Munas had examined Ted Katta for only fifteen minutes, Dr. Munas examined Ted three more times. Mr. Katta also visited a nurse, a dietician, a psychiatric social worker, a clinical psychologist, and a vocational psychologist before his death more than eight months later. As explained below, any "negligence" by Dr. Munas in not examining Ted Katta initially for a longer period of time was too remote to have proximately caused his death.

**17.** This refers to the April 11, 1990 testimony of Dr. Scheftner.

**18.** Again, as discussed below, the propriety of reducing Mr. Katta's Mellaril dosage is irrelevant, given that Mr. Katta had refused to take his medication for seven months prior to his death.

Mr. Katta on November 30, 1984. On the contrary, Dr. Munas testified that it was his regular practice to review a patient's previous history at the North Chicago VA before examining the patient. (Munas Tr. 50–51.) Simply because Dr. Munas did not mention Mr. Moore's 1982 PTSD diagnosis does not mean he was unaware of it. (*See* Munas Tr. 67–68.)

Similarly, any argument that Dr. Munas was negligent for failing to diagnose Ted Katta as having PTSD on November 30, 1984 is unavailing. Dr. Munas did not state that Mr. Katta had never suffered from PTSD. He simply testified that on November 30, 1984, when he examined him, Mr. Katta exhibited no symptoms of PTSD. (Munas Tr. 65.)

Given Mr. Katta's improved condition at the time, it cannot be said that based on the information known to Dr. Munas, his diagnosis that Mr. Katta suffered from paranoia was negligent. In any event, plaintiff has failed to demonstrate that a diagnosis of PTSD by Dr. Munas would have resulted in any different treatment for Mr. Katta.

■ Fourth, plaintiff argues that Dr. Munas was negligent in examining Ted Katta as an outpatient only on December 7 and December 20 of 1984, and January 3, 1985. However, at the time Dr. Munas made his decision to examine Ted Katta on an outpatient basis, Ted appeared to be close to fully remitted—he had no symptoms requiring involuntary admission. (Scheftner I Tr. 18; *see also Ill.Ann.Stat.* ch. 91½, ¶ 1–119 (Smith–Hurd 1987).)

The conclusion that Ted Katta's illness was in remission is supported by Ted Katta's behavior at the time. Both his mother and ex-wife testified that when Ted Katta was placed on outpatient status and returned to his parents' home in Chicago, his condition had improved markedly. His relations with his family during the holiday season were upbeat.

Not until January of 1985 was Helen Katta aware that her son's behavior was beginning to deteriorate. Neither Helen Katta nor any of Ted Katta's other family members informed the VA of Ted's worsening behavior. Based upon the information known to Dr. Munas at the time, it was not negligent for Dr. Munas to treat Ted Katta as an outpatient.

■ Fifth, plaintiff claims that the VA should have followed up better when Ted Katta failed to keep appointments scheduled with Dr. Munas for January 31, February 28, and March 27 of 1985. When a patient fails to appear for his or her appointment, it is the VA's practice to automatically reschedule him for a second and possibly a third appointment. (Weichers Tr. 136, 138; *see also* footnote 5, above.) The VA mails notification of the new appointments to the veteran along with a warning that if the veteran fails to keep the appointment or fails to notify the VA that the time must be changed, the VA may assume that the veteran no longer desires care. (Weichers Tr. 136–37; Gov. Ex. 4.) The VA had no way of knowing—because Ted Katta's family did not inform it—that Ted had been destroying mail sent to him by the VA.

When Ted Katta last saw Dr. Munas on January 3, 1985, he was in remission. (Pl. Ex. 3 at G000463.) Although Ted Katta's condition was not as good when he visited Dr. Santorum on January 22, 1985, the evidence reflects that Dr. Santorum carefully examined Mr. Katta for—and ruled out—any suicidal ideations. (Santorum Tr. 14–16.) Given these facts, the court finds persuasive Dr. Scheftner's testimony that, under the circumstances, the efforts of the VA to contact Ted Katta met the standard of care in the Chicago metropolitan community. (Scheftner II Tr.[19] 48.)

■ Finally, plaintiff asserts that the VA was negligent in discharging Ted Katta from clinic status because of his refusal to appear for appointments. However, the Government proved that the mere administrative act of discharging Mr. Katta from clinic status did not preclude him from coming back and receiving additional treatment. (Weichers Tr. 138.) Additionally,

---

**19.** This refers to the April 12, 1990 transcript of Dr. Scheftner's testimony.

the evidence demonstrated that the VA's procedure was to review charts before closing them so as to determine a patient's dangerousness to himself and to others. (Munas Tr. 79, 81.) Plaintiff presented no evidence to the contrary. Plaintiff has failed to prove that the VA's discharge of Ted Katta from clinic status constituted negligence.

In summary, considering the evidence as a whole, the court finds the VA's decisions relating to the treatment of Ted Katta to be not negligent.

The court also finds that the plaintiff has failed to prove causation. The court addresses this decisive issue next.

### 2. *Proximate Causation*

■■■■ Other than Mr. Katta's Vietnam experiences, the events giving rise to this litigation occurred in Illinois. The parties, therefore, do not dispute that Illinois tort law is controlling. 28 U.S.C. § 1346(b); *Richards v. United States*, 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962). Under Illinois law, a proximate cause is that cause which, in natural or probable sequence, produces the complained of injury. *Bogovich v. Nalco Chemical Co.*, 213 Ill.App.3d 439, 157 Ill.Dec. 579, 580, 572 N.E.2d 1043, 1044 (1st Dist.1991).

■■■■ "An injury follows in a natural or probable sequence from the acts in question if an ordinary prudent person ought to have foreseen that some injury might occur, although the precise injury which in fact occurred need not have been foreseen." *Id.* The cause must produce the injury through a natural and continuous sequence of events unbroken by any effective intervening cause. *Kemp v. Sisters of Third Order of St. Francis*, 143 Ill.App.3d 360, 97 Ill.Dec. 709, 710, 493 N.E.2d 372, 373 (3d Dist.1986).

■■■■ Plaintiff has the burden of proving the VA's alleged negligence by a preponderance of the evidence. *Wise v. St. Mary's Hospital*, 64 Ill.App.3d 587, 21 Ill.

Dec. 482, 484, 381 N.E.2d 809, 811 (5th Dist.1978). Plaintiff has failed to meet that burden.

■■■■ Plaintiff's medical expert, Dr. Langsley, was not as credible or convincing as defendant's medical expert, Dr. Scheftner. Dr. Langsley was markedly equivocal and unconvincing when posed questions relating to the proximate cause of Ted Katta's death. During his testimony, Dr. Langsley stated that Ted Katta's "potential for suicide should have been anticipated" (Langsley I Tr. 77), that his suicide was "potentially foreseeable" (*Id.* at 142), that "the death of Thaddeus Katta was a very likely outcome of the decisions that were made" by the VA (*Id.* at 145), and that the VA's actions (or inaction) made it "more likely" that Ted Katta would commit suicide. (*Id.* at 146–47).

Dr. Langsley did not testify, however, that the VA "ought to have foreseen" (*Bogovich*, 157 Ill.Dec. at 580, 572 N.E.2d at 1044) Ted Katta's death.[20] Indeed, when asked directly, Dr. Langsley refused to testify that Ted Katta's death was the "natural and probable" (*id.*) outcome of allegedly negligent VA decisions. (Langsley I Tr. 143–46.)

Based upon his testimony and demeanor, the court believes that Dr. Langsley was deliberately hedging on the issue of causation. Because Dr. Langsley refused to testify in a credible manner that the VA's alleged negligence, in natural or probable sequence, caused Ted Katta's death, plaintiff has failed to carry her burden of proving by a preponderance of the evidence that the VA's decisions were the proximate cause of Ted Katta's death.

As discussed above, plaintiff placed great weight on allegations that Dr. Munas examined Mr. Katta for only fifteen minutes, failed to determine that Mr. Katta suffered from PTSD, failed properly to follow-up on Mr. Katta's missed appointments, and inappropriately discharged Mr. Katta from clinic status when he repeated-

---

**20.** During his direct examination, Dr. Langsley stated that Mr. Katta's "potential for suicide should have been anticipated." (Langsley I Tr. 77.) However, when asked on cross-examina-

tion whether Mr. Katta's death was foreseeable, Dr. Langsley stated that it was only *"potentially* foreseeable." (*Id.* at 142 (emphasis added); *see also id.* at 143.)

ly missed scheduled appointments. As explained earlier, the court disagrees. However, even if the VA had acted other than it did, the court finds that Mr. Katta's persistent pattern of beginning treatment (and other activities) and then dropping out would have precluded the VA from providing any alternative treatment now urged by plaintiff in this litigation.

The court's conclusion is fortified by Mr. Katta's behavior: his statements to his wife that he would not go back to the VA; his repeated tearing up of mail received from the VA without reading it (behavior of which plaintiff but not the VA knew); his refusal to acknowledge the need for treatment (other than job counseling) to Ms. Cafaro; his statements to Ms. Cafaro and Ms. Haymes that he did not wish to return to the VA for further treatment; and his repeated failure to appear for appointments with Dr. Munas.

■■■ The VA, however, could not force Mr. Katta to keep his appointments. The plaintiff, not the VA, was in the position to seek involuntary commitment when Ted Katta's conduct supported it. Mr. Katta's merely missing doctors' or counselling appointments was not a sufficient basis for involuntary commitment. *See, e.g., Ill. Ann.Stat.* ch. 91½, ¶ 1–119, ¶ 3–600 *et seq., and* ¶ 3–700 *et seq.* (Smith–Hurd 1987).

Plaintiff also alleges that the VA negligently reduced Ted Katta's medication, Mellaril, from 600 to 400 mg. on November 30, 1984. As addressed above, the court disagrees based upon the evidence in the case. Even if such a reduction were negligent, however, Mr. Katta's death occurred over eight months after the reduction of medication. Such a lengthy lapse of time, combined with the fact that by December of 1984 Mr. Katta had stopped taking his medication altogether, emphasizes plaintiff's failure to prove that any reduction of Ted Katta's medicine proximately caused his death.

■■■ Exacerbating plaintiff's failure of proof as to proximate causation is the presence of an independent, effective intervening cause which the court finds broke any natural and continuous sequence of events resulting from the VA's decisions. *Kemp,* 493 N.E.2d at 373.[21] That independent, effective intervening cause was Ted Katta's perceived rejection by his family.

Between 1982 and 1985, while Ted Katta was living with his parents, his three sisters never offered to do anything to help him. During the three weeks before his death, when he was at his parents' home, all alone, Ted Katta asked first his young daughter and then his young son to visit him in Chicago. He was rebuffed by both children.

Given Ted Katta's abusive conduct toward his family, such responses from his sisters and his children are understandable. Nonetheless, it must have appeared to Mr. Katta that his family had abandoned him—especially given that his parents were away in Arizona and apparently difficult to reach for the three weeks before his suicide. Indeed, plaintiff's expert witness, Dr. Langsley, testified that Ted Katta's perception of lack of a solid and stable support system was one of the "risk factors" which indicated that Ted Katta was a potential suicide candidate. (Langsley II Tr. 72.)

The court in no way blames Ted Katta's family for their conduct during the weeks prior to his suicide. No one can understand the pain and difficulty they must

---

**21.** In *Boylan v. Martindale,* 103 Ill.App.3d 335, 59 Ill.Dec. 43, 431 N.E.2d 62 (2d Dist.1982), the court set forth the test for determining whether an intervening cause breaks a causal chain:

> The test that should be applied in all cases in determining the question of proximate cause is whether the first wrongdoer might have reasonably anticipated the intervening cause as a natural and probable result of the first party's own negligence. If the act of a third party is the immediate cause of the injury and is such as in the exercise of reason-

able diligence would not be anticipated and the third person is not under the control of the one guilty of the original wrong, the connection is broken and the first act or omission is not the proximate cause of the injury.

*Id.,* 59 Ill.Dec. at 49, 431 N.E.2d at 68 (citations omitted), *quoting Merlo v. Public Service Co.,* 381 Ill. 300, 300, 316–17, 45 N.E.2d 665 (1942). Plaintiff presented no evidence that the VA should have anticipated Ted Katta's perceived rejection by his family.

have experienced in dealing with Mr. Katta. Nonetheless, the court finds that Mr. Katta's perception of his family's conduct must have been one of rejection—rejection which, when combined with his depression associated with his PTSD, constituted an independent, effective intervening cause breaking any natural and continuous sequence of events resulting from the VA's decisions of seven months earlier—decisions plaintiff claims were negligent but which the court believes were not negligent.

Plaintiff's failure to prove by a preponderance of the evidence that the VA's conduct proximately caused Ted Katta's death provides a further and separate basis requiring entry of judgment for defendant.

## III. CONCLUSION

For the reasons stated in this memorandum opinion and order: (1) judgment is entered in favor of defendant and against plaintiff; (2) this case is dismissed in its entirety.